IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROCKROCK GROUP, LLC, a Washington limited liability company, and RUSSELLROCK GROUP, LLC, a Washington limited liability company, | ) ) ) ) ) | No. 32568-7-III |
| Appellants, | ) ) ) | |
| v. | ) ) | |
| VALUE LOGIC, LLC, a Washington limited liability company, TERRY SAVAGE and JANE DOE SAVAGE, a married couple, and JENNY BENSON AND JOHN DOE BENSON, a married couple, | ) ) ) ) ) ) ) | OPINION PUBLISHED IN PART |
| Respondents and Cross-Appellants, | ) ) ) ) | |
| ERIC SATCHJEN, WORKLAND WITHERSPOON, a domestic professional liability company, RIVERBANK, a domestic financial institution, | ) ) ) ) ) | |
| Defendants. | ) | |

LAWRENCE-BERREY, A.C.J. — An appraiser's liability for negligent

misrepresentation is limited to the person or one of a limited group of persons for whose

benefit and guidance he or she intended to supply the appraisal report or knew the recipient intended to supply it. Here, Value Logic appraised two properties and negligently reported the values of those properties to be much greater than their true values. The members of two LLCs relied on the reports. However, the reports were intended only for the benefit and guidance of RiverBank, the lender in the transactions. There was no evidence Value Logic intended to supply the reports for the benefit and guidance of the LLCs or their members. And there was no evidence Value Logic knew RiverBank would supply the reports to the LLCs or their members for their benefit and guidance.

In the published portion of this opinion, we conclude the trial court properly dismissed the LLCs' negligent misrepresentation claims. In the unpublished portion of this opinion, we affirm the trial court's summary dismissal of the LLCs' negligence and Consumer Protection Act (CPA), chapter 19.86 RCW, claims and we decline to address a constitutional argument raised for the first time on appeal.

## FACTS

The two appraised properties are a 51-acre property and an adjacent 39-acre property. The properties are located near Airway Heights, Washington. Both properties are vacant, and both are zoned partially rural traditional and partially light industrial.

2

A.    *Sundevil initiates purchases*

Gregory Jeffreys and his wife Kimberly Jeffreys operated a real estate development company called Sundevil Development, LLC.  In mid-2006, Mr. Jeffreys began negotiations to buy the two properties.  Mr. Jeffreys contacted Brian Main, a Spokane realtor.  Mr. Jeffreys told Mr. Main he had the two properties under purchase, knew someone who wanted to buy them, and the project would turn quickly and not financially expose Mr. Main.  Mr. Jeffreys said he would find financing for the purchases and put the documents together, and asked Mr. Main to find investors.  Mr. Jeffreys selected RiverBank to finance the purchases.

On September 20, 2006, Sundevil executed a purchase and sale agreement to purchase the 51-acre property for $475,000.  On September 25, 2006, Sundevil executed a purchase and sale agreement to purchase the 39-acre property for $300,000.

B.    *RiverBank retains Value Logic to appraise the properties*

In September 2006, RiverBank contacted Value Logic to request a bid to appraise both properties.  Value Logic bid $3,000 to appraise the larger property and $2,000 to appraise the smaller property.  RiverBank accepted the bids and directed Value Logic to appraise the properties.  Value Logic employee Jenny Benson inspected the properties on September 28.

3

On October 9, 2006, Value Logic sent RiverBank the appraisal for the 51-acre property. Value Logic reported the value of the larger property was $4,500,000, or $2.00 per square foot. On November 16, 2006, Value Logic sent RiverBank the appraisal for the 39-acre property.[1] Value Logic reported the value of the smaller property was $4,250,000, or $2.50 per square foot.

In its appraisal reports, Value Logic stated, "[t]he function of this appraisal is to provide the client [RiverBank], with a value estimate as a basis on which to provide financing and to facilitate a purchase." Clerk's Papers (CP) at 243, 258. The appraisal reports identified the clients as RiverBank and its employee, Rachel Pulis. The appraisal reports contained the following limitations of use:

> **Your attention is directed to all the Assumptions and Limiting Conditions on Pages 11 through 13.**
>
> . . . .
>
> This report is prepared for the sole use and benefit of the client . . . . Neither this report, nor any of the information contained herein shall be used or relied upon for any purpose by any person or entity other than the client. The appraiser is not responsible for the unauthorized use of this report.
>
> . . . .

---

[1] According to Value Logic, it submitted both appraisals on October 9, but then re-submitted the appraisal for the 39-acre parcel with a corrected property description in November.

Unless otherwise stated, this appraisal report is made expressly subject to the following conditions and stipulations:

1.    This appraisal report is considered confidential between the appraiser and the client.

. . . .

13.    The liability of [Value Logic] is limited to the client only and only up to the amount of the fee actually received for the assignment. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions.

. . . .

17.    Without prior written approval from the author, the use of this report is limited to internal decision making and financing. All other uses are expressly prohibited. Reliance on this report by anyone other than the client, [or] for a purpose not set forth above, is prohibited. The author's responsibility is limited to the client.

CP at 237-49, 252-64.

   C.    *Mr. Jeffreys and Mr. Main solicit investors*

Mr. Jeffreys and Mr. Main solicited investors to buy memberships in the LLCs.

They intended one LLC—RockRock Group, LLC—to purchase an interest in the 51-acre

property. They intended another LLC—RussellRock Group, LLC—to purchase an

interest in the 39-acre property.

Mr. Jeffreys called John Bart Johnson, who later agreed to be the manager of both LLCs. Mr. Jeffreys told Mr. Johnson he was getting a group of people together to buy some property near Airway Heights. He told Mr. Johnson, "with the appraisals I got,[2] we should be able—an idiot could come into these properties and make a quarter million dollars." CP at 451. Mr. Jeffreys explained he was going to get 10 people to be partners, and he would acquire the land and sell 75 percent to these 10 people, and keep 25 percent for himself. He said he would get the financing. Mr. Jeffreys described the venture as "short-term, get in, buy it, turn around and sell it." CP at 453.

Mr. Johnson visited the properties with Mr. Jeffreys. Mr. Jeffreys had copies of both appraisal reports with him and showed them to Mr. Johnson.[3] Mr. Johnson "look[ed] at an appraisal which was for four-point-some million." CP at 456. However,

---

[2] There is no evidence how Mr. Jeffreys came into possession of the appraisal reports.

[3] Mr. Johnson sent a co-investor an e-mail in September 2011 in which Mr. Johnson said, "They now are questioning if all the investors saw the appraisal before joining in? I personally did not see the appraisal I was just told by Jeffreys that they came in with large values." CP at 470. When deposed, Mr. Johnson nevertheless insisted he saw the appraisals: "I remember going into his pickup, looking at something, and then, five years later, I said that I did not see it. So I don't know." CP at 457.

In reviewing a summary judgment motion, this court views all facts in the light most favorable to the nonmoving party. *Borish v. Russell*, 155 Wn. App. 892, 900, 230 P.3d 646 (2010). In this case, RockRock and RussellRock are the nonmoving parties, so we present the facts as if Mr. Jeffreys showed the appraisals to Mr. Johnson.

Mr. Johnson "didn't [review the appraisal report for details]," but "just saw the bottom line." CP at 456.

In September 2006, Mr. Main called Kelly Hubbell, who was a friend of his from high school. Ms. Hubbell was a manager at Stan & Hubbs, LLC. Mr. Main asked Ms. Hubbell and other members of Stan & Hubbs to invest in the 51-acre property. Mr. Main pitched the investment to Ms. Hubbell with a prospectus. The prospectus stated the "[e]stimated current value equals $2.00 per sq. ft. *minimum* equals $4,443,120." CP at 668. Before the sale closed, Mr. Main told Ms. Hubbell that the appraised price of the 51-acre property was $4,500,000. Ms. Hubbell wrote this appraised value on her prospectus. Ms. Hubbell invested in RockRock, the eventual purchaser of the larger property.

Several weeks before the closing, Mr. Main also called David Largent. Mr. Main told Mr. Largent the appraisal came back, and the 51-acre property was worth what they expected—around $4,000,000. Mr. Largent and his wife both invested in RockRock.

In December 2006, Mr. Jeffreys held a meeting at his home to pitch the sale on the 39-acre property. Many potential investors attended. Mr. Jeffreys said the investors would purchase the parcel at one-half the price and would be able to sell it shortly for a very high profit. Mr. Jeffreys emphasized the 39-acre property was appraised for a very

high amount, and the appraisal report verified the property's value. Alan Cummins and Keith Watkins both attended this meeting and both eventually invested in RussellRock, the eventual purchaser of the smaller property.

D.     *RockRock is formed and buys 75 percent of the 51-acre property*

On October 2, Sundevil assigned to Mr. Main 75 percent of its right to purchase the 51-acre property. Mr. Main agreed to pay $1,630,000 for a 75 percent interest in the property. The following day, RockRock was formed. Mr. Main then assigned his purchase right in the property to RockRock. To finance the purchase, RockRock executed promissory notes in favor of RiverBank for $1,025,000, and in favor of Sundevil for $800,000. RockRock's members personally guaranteed the loans, and RockRock executed a deed of trust in favor of RiverBank to secure the loan. The sale closed on November 8.

E.     *RussellRock is formed and buys 75 percent of the 39-acre property*

On November 15, 2006, RussellRock was formed. Sundevil assigned to Mr. Main 75 percent of its right to purchase the 39-acre property. Mr. Main agreed to pay $1,630,000 for a 75 percent interest in this property. Mr. Main assigned his right to RussellRock.

8

Before signing the loan and personal guaranty documents, some of RussellRock's members asked to see Value Logic's appraisal with the loan documents. In particular, Mr. Cummins called Eric Sachtjen, the closing agent, and asked for a copy of the appraisal that Mr. Jeffreys had discussed at the December 2006 investor meeting. Mr. Sachtjen e-mailed Rachel Pulis at RiverBank and asked her for the appraisal. Mr. Sachtjen then e-mailed Mr. Johnson and RussellRock's members. Mr. Sachtjen's e-mail stated,

> I have been asked to include the appraisal for this project with each of your set [sic] of documents and I will do so. For now, I have attached the cover letter on the appraisal, which shows the appraised value at $4.25 million. The purchase price is $1.63 million.

CP at 467. Later that day, Mr. Sachtjen e-mailed the actual appraisal to all of RussellRock's members and Mr. Johnson. Mr. Cummins and Mr. Watkins both viewed the appraisal, and assert they would not have continued in the transaction had the appraised value been less than $4,250,000.

RussellRock financed the $1,630,000 purchase price by executing promissory notes to RiverBank for $990,000 and to Sundevil for $800,000. RussellRock's members personally guaranteed the loans, and RussellRock executed a deed of trust in favor of RiverBank to secure the loan. The sale closed on January 12, 2007.

9

F.    *Litigation begins*

RockRock and RussellRock (the LLCs) were not successful in selling the properties. By late 2009, balloon payments on the various notes were becoming due. For this reason, the LLCs applied to Coastal Community Bank to refinance at least a portion of the obligations. In September 2009, Coastal Community Bank retained Value Logic to re-appraise the two properties. Ms. Benson issued two new appraisal reports on September 25. This time, she appraised the 51-acre property at $3,375,000 and the 39-acre property at $2,550,000. Ms. Benson attributed the reduction in values mostly to a depressed real estate market.

In November 2009, RiverBank had an appraiser review Value Logic's 2009 appraisal report for the larger property. The review appraiser e-mailed RiverBank's vice president and alerted him to a problem with Value Logic's report. He stated Ms. Benson was correct that the light industrial portion of the property was worth $1.50 per square foot. However, he stated most of the acreage is zoned rural traditional, and that portion of the acreage was worth only $0.28 per square foot.

The review appraiser concluded the property was actually worth $1,427,100. He noted that RockRock bought the property in 2006 for $1,630,000, and the drop in the real estate market was consistent with his opinion of the property's current value.

RiverBank's vice president forwarded this e-mail to Mrs. Jeffreys and stated, "Our review appraiser didn't like the analysis that Jenny Benson did on RockRock." CP at 634. He then asked to discuss the issue with Mr. Jeffreys.

In late February 2010, RiverBank retained another appraisal company to appraise both properties. This company was separate from both Value Logic and the previous review appraiser. This new appraiser agreed the light industrial portions of the properties were worth $1.50 per square foot. However, the new appraiser believed the rural traditional portions of the properties were worth roughly $0.15 per square foot. The new appraiser concluded the 51-acre property was worth $1,220,000, and the 39-acre property was worth $520,000.

On June 16, 2011, RockRock and RussellRock sued Value Logic, Mr. Savage, and Ms. Benson. The gravamen of the complaint was Value Logic negligently overvalued the properties in its 2006 appraisal reports, and the LLC members relied on those values when they authorized Mr. Johnson to proceed with the purchases. The legal theories asserted in the complaint were negligent misrepresentation, negligence, and violation of the CPA.

Value Logic moved for summary judgment, arguing the statutes of limitations barred the LLCs' claims, it did not owe the LLCs a duty, and the LLCs did not justifiably

11

rely on its appraisal reports. The trial court granted Value Logic's summary judgment

motion. The trial court determined, as a matter of law, Value Logic did not owe the LLCs

a duty, and the LLCs did not justifiably rely on the appraisal reports. The trial court also

dismissed the CPA claims because the LLCs' claims centered on Value Logic's actions in

its professional capacity, not its entrepreneurial capacity. The LLCs appeal.

## ANALYSIS

A.      *Summary judgment standard of review*

This court reviews a summary judgment order de novo, engaging in the same

inquiry as the trial court. *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 140, 331 P.3d 40

(2014) (quoting *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000)).

Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome

of the litigation depends in whole or in part." *Atherton Condo. Apt.-Owners Ass'n Bd. of*

*Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). This court views all

facts and reasonable inferences in the light most favorable to the nonmoving party.

*SentinelC3*, 181 Wn.2d at 140. Summary judgment is appropriate only if reasonable

persons could reach but one conclusion from all the evidence. *Id.* (quoting *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993)).

When reviewing a civil case in which the standard of proof is clear, cogent, and convincing evidence, this court "'must view the evidence presented through the prism of the substantive evidentiary burden.'" *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)); *see also Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 973, 948 P.2d 1264 (1997). The burden of proof for negligent misrepresentation claims is clear, cogent, and convincing evidence. *Lawyers Title Ins. Corp. v. Soon J. Baik*, 147 Wn.2d 536, 545, 55 P.3d 619 (2002). Thus, we must determine whether, viewing the evidence in the light most favorable to the nonmoving party, a rational trier of fact could find that the nonmoving party supported its negligent misrepresentation claims with clear, cogent, and convincing evidence. *See Woody*, 146 Wn. App. at 22.

B. *Negligent Misrepresentation*

The LLCs argue Value Logic's appraisal reports negligently misrepresented the true values of the properties, and their members justifiably relied on the reported values in making their decisions to authorize the purchase of the properties.

13

In *Schaaf v. Highfield*, 127 Wn.2d 17, 22-23, 896 P.2d 665 (1995), the Supreme

Court held that a real estate appraiser's liability for negligent misrepresentation is defined

by *Restatement (Second) of Torts* § 552 (Am. Law Inst. 1977). That section provides in

relevant part:

> (1) One who, in the course of his business, profession or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false information
> for the guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their *justifiable reliance upon the information*, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information.
>
> (2) Except [for one under a duty to provide public information], the liability stated
> in Subsection (1) is limited to loss suffered
>
>> (a) by the person or one of a limited group of persons for whose benefit and
>> guidance *he intends to supply the information or knows that the recipient
>> intends to supply it*; and
>> (b) through reliance upon it in a transaction that he intends the information
>> to influence or knows that the recipient so intends or in a substantially
>> similar transaction.

RESTATEMENT § 552 (emphasis added).

In applying § 552, courts have set forth the following six elements, each which

must be proved by clear, cogent, and convincing evidence: (1) the defendant supplied

false information to guide others in their business transactions, (2) the defendant knew or

should have known that the information was supplied to guide the plaintiff in a business

transaction, (3) the defendant was negligent in communicating false information, (4) the

14

plaintiff relied on the false information, (5) the plaintiff's reliance on the false information was justified, that is, reasonable under the surrounding circumstances, and (6) the false information was the proximate cause of damages to the plaintiff. *See Lawyers Title*, 147 Wn.2d at 545; *ESCA v. KPMG Peat Marwick*, 135 Wn.2d 820, 827-28, 959 P.2d 651 (1998). The only elements at issue here are the second and the fifth—the duty of care element and the justifiable reliance element.

The particular duty, if any, owed by a defendant to a plaintiff is a question of law. *Schaaf*, 127 Wn.2d at 21-22 (quoting *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992)). Washington courts analyze a real estate appraiser's duty of care under the framework of the law of negligent misrepresentation. *Id.* at 21.

The *ESCA* trial court originated the six-element test set forth above in its jury instruction. *ESCA*, 135 Wn.2d at 827-28. In that case, the Supreme Court approved the jury instruction, but analyzed only the fifth element, justifiable reliance. *Id.* at 828-33. The Supreme Court in *Lawyers Title* analyzed the first, second, and fifth elements. *Lawyers Title*, 147 Wn.2d at 546-54. There, the Supreme Court hinted the second element might be inaccurate when it quoted the "knew or should have known" jury instruction the *ESCA* trial court gave and added: "*see also Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 162, 744 P.2d 1032, 750 P.2d 254 (1987) (*observing*

*that the duty element is met 'where . . . the defendant has knowledge of the specific injured party's reliance')." Lawyers Title*, 147 Wn.2d at 549 (emphasis added).

In *Bolser v. Clark*, 110 Wn. App. 895, 43 P.3d 62 (2002), we described the duty element consistent with the language of § 552. There, we quoted § 552 and defined the defendant's liability as being limited to persons for whose benefit and guidance the defendant intended to supply the appraisal report or knew the recipient intended to supply it. *Id.* at 901-03. We take this opportunity to reiterate this standard to clarify the second element of the negligent misrepresentation test. In accordance with § 552, adopted by our Supreme Court, a defendant's duty is limited to a loss suffered by a person or one of a limited group of persons for whose benefit and guidance the defendant intended to supply the information or knew that the recipient intended to supply it.

To defeat summary judgment, the LLCs must present evidence sufficient for a reasonable trier of fact to find by clear, cogent, and convincing evidence they have established the six elements of their negligent misrepresentation claims. The second element requires the LLCs to establish they were a limited group of persons for whose benefit and guidance Value Logic intended to supply the appraisal report or knew RiverBank intended to supply the appraisal report.

Here, Value Logic supplied the appraisal reports only for RiverBank's benefit and guidance. The reports state:

Purpose and Function

The purpose of this appraisal estimate is to estimate the market value of the subject property as it existed on September 28, 2006, the last date on which the proper was inspected. The function of this appraisal is to provide the client [RiverBank], with a value estimate as a basis on which to provide financing and to facilitate a purchase.

CP at 243, 258. Also as evidenced by the reports, Value Logic did not intend for anyone other than RiverBank to be guided by the reports—the reports define RiverBank as the client, state they were prepared for RiverBank's sole use and benefit, prohibit any person other than RiverBank from using or relying on them, and state the appraisals were confidential between Value Logic and RiverBank.

The LLCs argue that under *Schaaf* a real estate appraiser's duty of care extends "to those involved in the transaction that triggered the appraisal report." *Schaaf*, 127 Wn.2d at 27. However, *Schaaf* did not address the situation where a real estate appraiser did not intend to supply the appraisal reports for the buyer's benefit or guidance and also did not know the lender intended to do so.

The LLCs also argue Value Logic may not insulate itself from third-party tort liability with disclaimer language in its appraisal report. This precise issue was squarely

addressed in *Bolser v. Clark.* In *Bolser*, Jerry Bolser was in the midst of a marriage

dissolution when he hired Stewart Clark to appraise property owned by Bolser

Enterprises. *Bolser*, 110 Wn. App. at 898. Bolser Enterprises consisted of Jerry Bolser,

his brother Tom Bolser, and their mother Ellen Bolser. *Id.* The purpose for the appraisal

was to value Jerry Bolser's interest in Bolser Enterprises for purposes of dividing marital

property. *Id.*

Prior to the appraisal's completion, Bolser Enterprises began a partnership

dissolution. *Id.* Mr. Clark eventually completed his appraisal report. *Id.* The cover letter

to the report contained limiting language, stating its purpose was for the marriage

dissolution, and purported to restrict its use to that purpose. *Id.* The Bolser Enterprises

partners settled their litigation, with Jerry Bolser and Ellen Bolser buying out Tom Bolser.

*Id.* at 898-99. In determining a fair value for Tom Bolser's partnership interest, Bolser

Enterprises relied on Mr. Clark's appraisal report. *Id.* It was later determined the report

significantly overvalued the appraised property. *Id.* Bolser Enterprises sued Mr. Clark

for negligent misrepresentation.

At trial, substantial evidence supported the trial court's finding that Mr. Clark

knew his report would be used by Bolser Enterprises in the partnership dissolution case.

*Id.* at 900. The evidence included testimony that Bolser Enterprises paid Mr. Clark for

18

the appraisal, and a letter confirming Mr. Clark's availability to testify in the partnership

dissolution case. *Id.* at 899-900.

On appeal, Mr. Clark argued that the limiting language in the cover letter to his

appraisal report insulated him from liability. We stated,

> [D]uty is not negated by the language in the appraisal cover letter restricting the report's use to the dissolution proceedings. Although such express limitations in an appraisal can limit an appraiser's duty to unknown plaintiffs and transactions, here [Mr.] Clark knew of and acquiesced in Bolser Enterprises' intent to rely on his appraisal in partnership decisions. *Cf. Pahre v. Auditor*, 422 N.W.2d 178, 181 (Iowa 1988) (holding defendant did not owe duty to plaintiff where title report specifically limited its use and coverage *and* there was no evidence that title company knew third party would see report).

*Bolser*, 110 Wn. App. at 902-03.

We agree with the LLCs that limiting language in an appraisal report is not

dispositive. But here there is no evidence Value Logic either intended to supply the

appraisal reports for the LLCs' benefit or guidance, or knew RiverBank intended to do so.

The LLCs thus have failed to establish that Value Logic owed them a duty. We conclude

the trial court did not err by dismissing the LLCs' negligent misrepresentation claims.

Because we conclude Value Logic did not owe the LLCs a duty, we need not determine

whether the LLCs justifiably relied on the appraisal reports or whether the LLCs brought

their causes of action within the applicable period of limitations.

Affirmed.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished opinions.

C.     *Negligence claim*

The LLCs argue the trial court erred in dismissing their negligence claims against Value Logic. They fail to explain what duty, apart from the duty set forth in § 552(1), Value Logic supposedly breached. We fail to see any either and conclude the trial court did not err by dismissing the LLCs' negligence claims.

D.     *CPA claims*

The LLCs argue the trial court erred when it dismissed their CPA claims against Value Logic. Value Logic responds the CPA claims were properly dismissed because Washington's CPA does not apply to professional services of real estate appraisers.

The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct *of any trade or commerce* are hereby declared unlawful." RCW 19.86.020 (emphasis added). Accordingly, to prevail in a private CPA action, the plaintiff must establish five elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his

20

or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). A plaintiff suing under the CPA must establish all five elements, and a CPA claim fails if a plaintiff fails to establish any one element. *Id.* at 793.

In *Short v. Demopolis*, the Washington Supreme Court considered whether the practice of law falls within the CPA's definition of "trade or commerce." 103 Wn.2d 52, 55, 691 P.2d 163 (1984). In that case, Mr. Demopolis retained a law firm to represent him in dissolving a real estate partnership and in a real estate forfeiture action. *Id.* at 53. Mr. Demopolis claimed that he specifically hired the partner with whom he consulted to represent him in the cases, and the partner gave the actual legal work to a junior partner and an associate. *Id.* at 53-54. The court held that certain entrepreneurial or business aspects of the practice of law fall within the CPA's definition of "trade or commerce"; for example, how the price of legal services is determined, billed, and collected, and the way a law firm obtains, retains, and dismisses clients. *Id.* at 60-61.

However, *Short* further held that the substantive quality of services an attorney provides does not fall within the definition of "trade or commerce." *Id.* at 61. And claims "directed to the competence of and strategy employed" by attorneys constitute allegations of negligence or malpractice, and as such, are not actionable under the CPA.

21

*Id.* at 61-62. *Short* concluded Mr. Demopolis's claims that his attorneys failed to gather essential facts, pursue certain claims, and file a timely judgment were all exempt from the CPA. *Id.* at 61.

In *Ramos v. Arnold*, Division One extended *Short*'s holding to real estate appraisers. *Ramos v. Arnold*, 141 Wn. App. 11, 14, 169 P.3d 482 (2007). In *Ramos*, Mr. and Mrs. Ramos filed a CPA claim against Debbie Arnold for failing to include residential defects in the appraisal report. *Id.* at 16. Citing *Short*, the *Ramos* court determined the complaint targeted the alleged inadequacy of the appraisal rather than the entrepreneurial aspect of the appraiser's business. *Id.* at 20. Because the CPA claim described an allegation of negligence, the *Ramos* court affirmed the trial court's summary dismissal of the CPA claim. *Id.* at 21.

Here, the gravamen of the complaint is that Value Logic was negligent in reporting the values of the properties, and the members of the LLCs relied on the values reported in authorizing the managing member to purchase the properties. As in *Ramos*, the LLCs' complaint targets the alleged inadequacy of the actual appraisals rather than any entrepreneurial aspect of Value Logic's business. We conclude Value Logic's actions do not fall within the CPA's definition of "trade or commerce." Because the LLCs have

22

failed to establish this element, the trial court properly dismissed their CPA claims on summary judgment.

E.    *Invitation to lower the evidentiary standard for negligence actions against real estate appraisers*

The LLCs invite this court to re-examine the clear, cogent, and convincing standard of proof that applies to negligence actions against real estate appraisers. They argue the higher standard of proof "gives appraisers a special privilege in violation or [sic] Article I, section 12 of the Washington Constitution." Appellants' Br. at 39. The LLCs did not raise this issue below. We generally decline to address issues not raised below. RAP 2.5(a).

One exception to this general rule involves a manifest constitutional error. RAP 2.5(a)(3). "A constitutional error is manifest where there is prejudice, meaning a plausible showing by the appellant that the asserted error had practical and identifiable consequences . . . ." *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015), *review denied*, No. 92191-1 (Wash. Feb. 10, 2016). Here, the LLCs' negligent misrepresentation claims were not dismissed because of the high evidentiary burden of proof, but because there was *no* evidence Value Logic (1) provided the appraisal reports for the LLCs' benefit or guidance, or (2) knew RiverBank intended to supply the appraisal reports to the

23

No. 32568-7-III
*RockRock Group, LLC v. Value Logic, LLC*

LLCs.  Because the alleged constitutional error is irrelevant due to how we decided this

appeal, it is not manifest and we decline to address it.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Korsmo, J.

Pennell, J.

24