FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 APR -9  AM 9: 23

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| ACCESS THE USA, LLC, a Washington limited liability company, 520 BRIDGE REPLACEMENT FUND II, LP, a Washington limited partnership, and PREMIER 520 BRIDGE REPLACEMENT FUND II, LP, a Washington limited partnership, ) ) ) ) ) ) ) | No. 75747-4-I |
| Appellants, ) ) ) | |
| v. ) ) ) | |
| THE STATE OF WASHINGTON, a government entity; THE OFFICE OF THE TREASURER, a government entity and agency of the State of Washington; CITIGROUP GLOBAL MARKETS, a New York corporation, ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION

FILED: April 9, 2018 |
| Respondents. ) ) | |

VERELLEN, C.J. — Access the USA, LLC formed limited partnerships with foreign investors under the EB-5 Immigrant Investor Program, intending to invest in State-issued bonds to fund construction of the new SR-520 Bridge. Access submitted applications to open accounts with Citigroup Global Markets, the lead underwriter. But on the bond pricing day, Citigroup had not opened accounts for the limited partnerships, who were therefore unable to purchase bonds. Access

No. 75747-4-I/2

sued Citigroup on theories of violation of the Consumer Protection Act (CPA),[1] breach of contract, promissory estoppel, and negligent misrepresentation. Access also sued the State, alleging tortious interference with business expectancy and negligent misrepresentation.

Because Access's alleged claims of deception are limited to its unique private interaction with Citigroup and no hypothetical facts support an impact on the public interest, the trial court properly dismissed its CPA claim under CR 12(b)(6).

Because Access fails to establish an enforceable contract, the trial court properly dismissed Access's breach of contract claim on summary judgment.

Access offers no facts or reasonable inferences of an actionable promise or reliance. The trial court properly dismissed Access's promissory estoppel claim against Citigroup.

Because Access cannot point to a false statement by Citigroup or the State of a presently existing fact, the trial court properly dismissed its claims for negligent misrepresentation.

Access establishes neither an intentional interference nor an improper purpose or means. The trial court properly dismissed Access's claim that the State intentionally interfered with its business expectancy.

Therefore, we affirm.

---

[1] Ch. 19.86 RCW.

2

No. 75747-4-I/3

## FACTS

The EB-5[2] Immigrant Investor Program (EB-5 Program) allows foreign investors and their families to obtain residency in the United States. The EB-5 Program is administered by the United States Citizenship and Immigration Service (USCIS). Qualifying investments must meet threshold requirements for job creation, term of investment, and risk. The investments are prepared by USCIS-approved regional centers.

Access is an approved regional center. Michael Mattox manages Access. He developed a municipal bond investment strategy. In this model, foreign investors participate in limited partnerships, which purchase municipal infrastructure bonds. Access served as general partner in these limited partnerships. Together with other requirements, each EB-5 applicant must invest at least $1,000,000.[3] Access forms and manages the limited partnerships that serve as the "funding accounts" for foreign investments. As part of Access's effort to establish funding accounts for a May 2012 bond offering, Access and its investors established two Washington limited partnerships.

Washington bond sales are conducted pursuant to recognized procedures established by the legislature and the Office of the State Treasurer. The Office of the State Treasurer competitively selects underwriters and establishes a lead underwriter. Each selected underwriter has a long history of working with State

---

[2] Employment-Based Immigration, Fifth Preference.

[3] The minimum qualifying investment to participate either within a high unemployment or rural area in the United States is $500,000.

3

bond offerings and extensive experience in municipal bond offerings. Through its bond offerings, the State sells its bonds to underwriters. The underwriters, pursuant to a contract with the State, select the investors to purchase the bonds.

To purchase bonds, an investor must open an account with an underwriter. The process of opening an account with the underwriter is called "onboarding." Citigroup was the lead underwriter for the bond offering at issue in this appeal. Each underwriter determines its own onboarding process. Citigroup conducts a process that complies with federal money laundering and other regulations.

Before any SR-520 bond offering, Mattox contacted Ellen Evans, the deputy treasurer for debt management at the Office of the State Treasurer, asking for a private sale of those State bonds. Evans declined, explaining that the State "has a long-standing history of raising money exclusively through public sales of State securities and . . . we value the transparency of the public marketplace."[4] Evans learned that Mattox had reached out to other State officials "to promote his investment program,"[5] which made her wary. Evans advised members of the finance team and other State officials to respond that the State finances its capital projects with public sales of securities. Evans was concerned about the potential impact an EB-5 Program investment could have on the purchase of the bonds. Evans did not understand how State bonds qualify for the EB-5 program because of the low risk due to the State's excellent credit rating and because an investor's purchase would not itself create jobs.

---

[4] Clerk's Papers (CP) at 1029.

[5] Id.

4

Evans was also cautious of the potential impact an EB-5 investment could have on the volatility of the Washington bond market—if the federal government did not approve Mattox's proposed EB-5 investment plan, all the bonds purchased on behalf of those investors would likely be placed on the secondary market for noneconomic reasons.

*I. First Bond Offering*

In October 2011, Access purchased $48,000,000 in bonds in a State bond offering for the SR-520 project (2012C). J.P. Morgan Securities LLC served as the lead underwriter. USCIS had not previously approved a purchase of publicly-issued bonds as a qualifying EB-5 investment.

State employees were aware of Access's interest in the bonds and communicated with J.P. Morgan representatives about its vetting process. Evans was involved in this communication, telling J.P. Morgan she did not understand how the State's bonds would fit within the EB-5 program because there was little risk involved, and the investor's bond purchase was not itself creating jobs. Evans encouraged J.P. Morgan to perform due diligence on Access and its investors. J.P. Morgan completed its account creation process and sold some of the 2012C bonds to Access.

*II. Second Bond Offering*

The State scheduled a second bond offering for May 22, 2012, called GARVEE[6] 2012F (2012F) with Citigroup Global Markets as the lead underwriter.

---

[6] GARVEE stands for Grant Application Revenue Vehicle, and refers to a debt instrument backed by a pledge from the federal government for future Title 23 funding. GARVEE bonds enable the State to accelerate construction

In November 2011, Access, together with its investors, established two Washington limited partnerships[7] (the LP Funds) and placed the limited partnership assets in escrow. Mattox intended that the LP Funds would purchase $143,000,000 in bonds. Mattox received millions from investors, all before any communication with Citigroup about the offering.

Mattox initially contacted representatives from J.P. Morgan to onboard the 2012F LP Funds, but was advised "to place its order through Citigroup."[8]

Mattox called Citigroup's director of institutional sales, John Leahy, on April 9, 2012. Mattox told Leahy he wanted to open new client accounts with Citigroup and place an order in the anticipated 2012F offering. According to Mattox, Leahy said "he would begin the account opening process at Citigroup so that Access the USA and the 2012F Limited Partnerships could participate in the 2012F Offering."[9]

Leahy e-mailed Mattox on April 16, 2012, asking if "there's someone we can call to get the paperwork started."[10] On April 30, Mattox sent electronic copies of Access's information to Leahy to "facilitate the account setup."[11] Over the following weeks, Mattox and Leahy communicated regarding onboarding

---

timelines for a project and spread the cost of transportation infrastructure over its useful life.

[7] The 520 Bridge Replacement Fund II, LP and Premier 520 Bridge Replacement Fund II, LP.

[8] CP at 1587.

[9] CP at 946-47.

[10] CP at 1479.

[11] CP at 1458.

issues. Leahy e-mailed Mattox on May 9 asking for his percentage of ownership interest. And up to two business days before the offering, Mattox sent Citigroup documents for the onboarding process. The stated investment purpose raised concerns with Citigroup and the Office of the State Treasurer.

Representatives from the State, including Evans, worked with representatives from Citigroup leading up to the 2012F bond offering to facilitate the sale. Similar to her position before the first bond offering, Evans remained concerned whether State bonds were appropriate for the EB-5 program because of their low risk and whether EB-5 investors owning State bonds would increase volatility in the State bond market. Evans expressed her concerns in meetings which Citigroup representatives attended.

According to Jay Wheatley,[12] Citigroup's underwriter responsible for allocating the bonds, he had never talked to anyone with the State about Mattox or Access and acknowledged that there "were some concerns, but nothing to the degree of we don't want their interest."[13] Citigroup employees Leahy and Jerry Bobo acknowledged they were aware of Evans' concern but they had their own concerns about the relationship between the bonds and the EB-5 program.

Citigroup was unable to complete the onboarding for the LP Funds before the offering date, and accounts were never opened. Therefore, the LP Funds were unable to purchase any bonds in the 2012F bond offering.

---

[12] Also referred to as George Wheatley throughout the record.

[13] CP at 1164-65; see also CP at 1173 (Wheatley's colleague Joseph Connellan corroborates Wheatley's deposition testimony).

7

On the evening of the failed purchase, Mattox e-mailed the State Treasurer saying he learned the State directed the underwriters not to sell bonds to his "company because of the concern of negative publicity of our investors."[14] In the e-mail, Mattox does not include any suggestion that Access had a contract with Citigroup to buy bonds or that Citigroup had promised to sell them bonds. Mattox e-mailed the agents for his investors and Citigroup, repeating his belief that they had been discriminated against. According to Mattox, Leahy told him in a phone call that there was nothing he could do, and "things are going on in the back room that I can't tell you about, you are not getting your bonds."[15]

### III. Procedural History

Access sued the State and Citigroup.[16] Access alleged discrimination, violation of the Washington securities act,[17] and violation of the CPA. The United States District Court for the Western District of Washington dismissed Access's federal discrimination claim and, upon remand, the King County Superior Court dismissed the remaining state law claims, including the CPA claim, under CR 12(b)(6).

Access filed an amended complaint alleging Citigroup breached its oral agreement with Access, the State tortuously interfered with Access's business expectancy or contract with Citigroup, Access relied on Citigroup's promises to its detriment, and that Citigroup and the State made negligent

---

[14] CP at 1519.

[15] CP at 1592.

[16] Access named other defendants, but they were dismissed.

[17] Ch. 21.20 RCW.

misrepresentations. The trial court granted summary judgment in favor of Citigroup and the State and denied Access's motion for reconsideration.

Access appeals.

## ANALYSIS

We review summary judgment decisions de novo.[18] The moving party must show there are no genuine issues of material fact.[19] Once a moving defendant makes this showing, the burden shifts, "and if the plaintiff fails to make a showing sufficient to establish the existence of an element essential to its case, on which it will bear the burden of proof at trial," summary judgment in favor of the moving defendant is appropriate.[20]

We review a CR 12(b)(6) dismissal de novo.[21] Dismissal is appropriate "only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove 'any set of facts which would justify recovery.'"[22] "'We regard "the plaintiff's allegations in the complaint as true and consider hypothetical facts outside the record."[23] "'[A]ny hypothetical situation conceivably raised by the complaint defeats a [CR] 12(b)(6) motion if it is legally sufficient to support plaintiff's

---

[18] Mohr v. Grantham, 172 Wn.2d 844, 859, 262 P.3d 490 (2011).

[19] Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

[20] Simmons v. City of Othello, 199 Wn. App. 384, 390, 399 P.3d 546 (2017).

[21] Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007).

[22] Id. (quoting Tenore v. AT & T Wireless Servs., 136 Wn.2d 322, 330, 962 P.2d 104 (1998)).

[23] Deegan v. Windermere Real Estate/Center-Isle, Inc., 197 Wn. App. 875, 884, 391 P.3d 582 (2017) (quoting FutureSelect Portfolio Mgmt. v. Tremont Grp. Holdings, Inc., 175 Wn. App. 840, 865, 309 P.3d 555 (2013)).

claim.'"[24] Trial courts grant motions to dismiss "'sparingly and with care,'" and "'only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'"[25]

I. Claims Against Citigroup

*A. CPA*

Access argues it alleged sufficient facts supporting its CPA claim and that it should have survived a CR 12(b)(6) motion.

The CPA aims to "protect the public and foster fair and honest competition."[26] To prevail in a CPA action, a plaintiff must establish (i) an unfair or deceptive act or practice, (ii) occurring in trade or commerce, (iii) a public interest impact, (iv) injury to plaintiff's business or property, and (v) that the injuries were caused by the unfair or deceptive act or practice.[27] Whether a particular action gives rise to a CPA violation presents a question of law.[28]

Access contends Leahy's statements about creating accounts for the LP Funds were unfair or deceptive.

"The 'unfair or deceptive' element can be established in one of three ways: (i) per se unfair or deceptive conduct, (ii) an act that has the capacity to deceive

---

[24] Id. (alterations in original) (quoting Halvorson v. Dahl, 89 Wn.2d 673, 674, 574 P.2d 1190 (1978)).

[25] Kinney, 159 Wn.2d at 842 (internal quotation marks omitted) (quoting Hoffer v. State, 110 Wn.2d 415, 420, 755 P.2d 781 (1988)).

[26] RCW 19.86.920.

[27] Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986).

[28] Leingang v. Pierce County Med. Bureau, Inc., 131 Wn.2d 133, 150, 930 P.2d 288 (1997).

a substantial portion of the public, or (iii) an unfair or deceptive act or practice not regulated by statute but in violation of the public interest."[29] Deception exists where there is a representation, omission or practice that is likely to mislead a reasonable consumer.[30] Neither intent nor actual deception is required to prove a deceptive act or practice, the focus is whether the conduct "has the *capacity* to deceive a substantial portion of the public."[31] But in applying the capacity to deceive requirement, our concern "has been to rule out those deceptive acts and practices that are *unique to the relationship between plaintiff and defendant.* The definition of 'unfair' and 'deceptive' must be objective to prevent every consumer complaint from becoming a triable violation of the act."[32] Accurate information may be deceptive "if there is a representation, omission or practice that is likely to mislead."[33] "'Misrepresentation of the material terms of a transaction or the failure to disclose material terms violates the CPA.'"[34]

The acts and practices of Citigroup were unique to the relationship between the parties. Access cannot show "a real and substantial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or

---

[29] State v. Mandatory Poster Agency, Inc., 199 Wn. App. 506, 518, 398 P.3d 1271 (2017).

[30] Panag v. Farmers Ins. Co. of Wash., 166 Wn.2d 27, 50, 204 P.3d 885 (2009) (quoting Sw. Sunsites, Inc. v. Fed. Trade Comm'n, 785 F.2d 1431, 1435 (9th Cir. 1986)).

[31] Hangman Ridge, 105 Wn.2d at 785.

[32] Behnke v. Ahrens, 172 Wn. App. 281, 292-93, 294 P.3d 729 (2012) (emphasis added).

[33] Panag, 166 Wn.2d at 50.

[34] Bain v. Metropolitan Mortg. Grp., Inc., 175 Wn.2d 83, 116, 285 P.3d 34 (2012) (quoting State v. Kaiser, 161 Wn. App. 705, 719, 254 P.3d 850 (2011)).

deceptive act's being repeated."[35] Here, Access alleged (i) it made a single attempt to purchase bonds for the May 2012 offering, (ii) it provided "a unique and mutually beneficial service" to foreign investors, and (iii) these investors were only able to invest in limited debt offerings meeting specific criteria.

As a separate element, a claimant must establish an unfair or deceptive act which is "injurious to the public interest."[36] Access's contention that this private dispute affects the public interest is not persuasive. Generally, "a breach of private contract affecting [only] the parties to the contract is not an act or practice affecting the public interest."[37] "[I]t is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes a factual pattern from a private dispute to one that affects the public interest."[38] Our Supreme Court has looked to four factors to determine public interest:

> (1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions? As with the factors applied to essentially consumer transactions, not one of these factors is dispositive, nor is it necessary that all be present. The factors in both the "consumer" and "private dispute" contexts represent indicia of an effect on public interest from which a trier of fact could reasonably find public interest impact.[39]

Here, Access neither alleges nor argues any hypothetical fact that Citigroup solicited its business. Access suggests Citigroup's failure to onboard

---

[35] Behnke, 172 Wn. App. at 295.

[36] RCW 19.86.093.

[37] Behnke, 172 Wn. App. at 293.

[38] Hangman Ridge, 105 Wn.2d at 790.

[39] Id. at 790-91.

the LP Funds forced Citigroup to purchase the remainder of the bonds for resale on the secondary market, decreasing the bonds' marketability "to the detriment of Washington citizens."[40] But Access does not offer authority that sales on the secondary market for bonds frustrated the goals of the CPA. Moreover, there is no allegation or hypothetical fact that the unique interaction with the LP Funds for the purpose of participating in the 2012F bond offering has or will injure others in "exactly the same fashion."[41] This was a private dispute about opening private accounts.[42]

We conclude the trial court properly dismissed Access's CPA claim under CR 12(b)(6) because Access did not allege anything more than a private dispute with no public impact.

*B. Breach of Contract*

Access argues Citigroup breached its agreement to onboard the LP Funds and present the bond orders.

A plaintiff must establish the existence of a valid contract, breach, and damages proximately caused by the breach.[43] To form a contract, the parties must objectively manifest their mutual assent.[44] Typically, this manifestation

---

[40] Appellant's Br. at 20.

[41] Behnke, 172 Wn. App. at 293.

[42] In passing, Access also contends Citigroup and the State abused open market principles by removing "marginalized or minority interests from public bond sales," Appellant's Br. at 20, but offers no compelling authority supporting this theory of public impact.

[43] Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

[44] Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 177, 94 P.3d 945 (2004).

includes an offer and acceptance.[45] "An offer consists of a promise to render a stated performance in exchange for a return promise being given."[46] "Acceptance is the offeree's communication by word, sign, or writing to be bound" by the terms of the offer.[47] The terms of the agreement must be sufficiently definite.[48] "If an offer is so indefinite that a court cannot decide just what it means, and fix exactly the legal liability of the parties, its acceptance cannot result in an enforcible agreement."[49] As acknowledged by our Supreme Court, the primary concern regarding valid contract formation is to "avoid trapping parties in surprise contractual obligations."[50]

Access contends Citigroup agreed to onboard the LP Funds and present the bond orders in exchange for receiving Access's business. Access argues the following exchange constituted a valid offer and acceptance:

> First, Mr. Leahy offered to onboard the [LP Funds] in exchange for the right to present their orders to Citigroup's underwriters. In accepting this offer, Mr. Mattox lost the opportunity to work with [J.P. Morgan].[51]

But in Mattox's declaration, he said:

---

[45] Id. at 178.

[46] Pac. Cascade Corp. v. Nimmer, 25 Wn. App. 552, 556, 608 P.2d 266 (1980).

[47] Taufen v. Estate of Kirpes, 155 Wn. App. 598, 603, 230 P.3d 199 (2010).

[48] Keystone Land & Dev. Co., 152 Wn.2d at 178.

[49] Sandeman v. Sayres, 50 Wn.2d 539, 541, 314 P.2d 428 (1957).

[50] Keystone Land & Dev. Co., 152 Wn.2d at 178 (quoting Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 497 (S.D.N.Y.1987)).

[51] Appellant's Br. at 23.

> During this initial conversation, he was confident that Citigroup *would* be able to onboard the 2012F LPs and set up the accounts necessary to present their orders. John Leahy also told me that because he was a Citigroup trader and Citigroup was underwriting the deal, and that Citigroup was the lead in determining the allocation of bonds which *would* put us in a good position to get the bonds we needed . . .
>
> . . . On this basis, and being satisfied with what Mr. Leahy said to me, I agreed that Citigroup should go forward with the plan.[52]

Washington courts routinely reject contract claims based on preliminary negotiations and informal discussions.[53] Here, the record is devoid of an objective manifestation. At most, Leahy expressed optimism about opening accounts and placing orders. He used terms that were prospective in nature, such as "would be able to" and that it "would put us in a good position."[54] There was neither a promise that the bonds would be issued nor a guaranteed outcome of the onboarding process. The onboarding depended on the due diligence and know-your-customer standards.[55] Leahy could not guarantee the LP Funds would satisfy Citigroup's onboarding requirements, Mattox and Leahy were aware it was a complicated process, and Leahy's efforts are evidenced by the continuing requests for more information and his communication with other

---

[52] CP at 1588 (emphasis added).

[53] See Keystone Land & Dev. Co., 152 Wn.2d at 178-79 (no contract where defendant stated it was "prepared to negotiate" and the parties could later draft an agreement); Pac. Cascade Corp., 25 Wn. App. at 558 ("the parties' informal exchange of correspondence did not result in a contractual relationship"); see also BP W. Coast Prods. LLC v. SKR Inc., 989 F. Supp. 2d 1109, 1121 (W.D. Wash. 2013) (rejecting contract claim on summary judgment because agreement to use "best efforts" to fill buyers' orders did not establish a duty to perform).

[54] CP at 1588.

[55] 31 U.S.C. § 5318(h) & (i); 31 C.F.R. § 1020.210 & .220.

No. 75747-4-I/16

Citigroup representatives. These preliminary discussions between Mattox and Leahy do not establish an enforceable contract.

We conclude the trial court properly granted summary judgment dismissing Access's breach of contract claim.

*C. Promissory Estoppel*

Alternatively, Access argues it justifiably relied on Citigroup's promise.

Under promissory estoppel, the plaintiff must show:

"(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."[56]

The doctrine "was developed to cover certain situations in which consideration is lacking."[57] Promissory estoppel requires a promise that is clear and definite.[58] Our Supreme Court "has adopted the *Restatement*'s definition of 'promise': 'A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has

---

[56] Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 171-72, 876 P.2d 435 (1994) (alteration in original) (quoting Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wn.2d 255, 259 n.2, 616 P.2d 644 (1980)).

[57] Hatfield v. Columbia Fed. Sav. Bank, 57 Wn. App. 876, 885, 790 P.2d 1258 (1990).

[58] Havens, 124 Wn.2d at 173. Contrary to Access's arguments that this standard is limited to the employment setting, Washington cases have applied the clear and definite standard in other settings. See Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc., 169 Wn. App. 111, 128, 279 P.3d 487 (2012); State v. Miller, 32 Wn.2d 149, 158, 201 P.2d 136 (1948); Viewcrest Condo. Ass'n v. Robertson, 197 Wn. App. 334, 337, 387 P.3d 1147 (2016); Peters v. Watson Co., 40 Wn.2d 121, 122-23, 241 P.2d 441 (1952).

16

been made.'"[59] The promise "must be explicit rather than implicit," and promissory estoppel "'may not be used as a way of supplying a promise.'"[60]

Similar to its breach of contract theory, Access suggests Leahy "promised to onboard the 2012F LPs and present their orders."[61] Access also contends Leahy promised that Citigroup "would accept the 2012F LPs' orders if placed through [another broker,] LPL Financial."[62]

But a promise that is "'vague, general or of indeterminate application' is not enforceable."[63] In his declaration, Mattox said he asked Leahy "whether Citigroup could onboard" the LP Funds before the pricing day, and Leahy responded that it "*would* not be a problem" and "Citigroup was the lead in determining the allocation of bonds *which would put us* in a good position."[64] Statements of mere future intent are insufficient to constitute a promise under the doctrine.[65] "An intention to do a thing is not a promise to do it."[66] An enforceable promise requires "an express undertaking or agreement" that "'something shall

---

[59] Wash. Educ. Ass'n v. Dep't of Ret. Sys., 181 Wn.2d 212, 225, 332 P.3d 428 (2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981)).

[60] Tacoma Auto Mall, Inc., 169 Wn. App. at 128 (quoting Havens, 124 Wn.2d at 173).

[61] Appellant's Br. at 26.

[62] Appellant's Br. at 27.

[63] Aguilar v. Int'l Longshoremen's Union Local No. 10, 966 F.2d 443, 446 (9th Cir. 1992) (quoting Hass v. Darigold Dairy Prods. Co., 751 F.2d 1096, 1100 (9th Cir. 1985)).

[64] CP at 1588 (emphasis added).

[65] Elliot Bay Seafoods, Inc. v. Port of Seattle, 124 Wn. App. 5, 13, 98 P.3d 491 (2004).

[66] Id.

happen . . . in the future.'"[67] Here, the alleged promise relies on statements of intent, not promises to perform. Leahy could not guarantee or promise new accounts because federal law required Citigroup to thoroughly vet new applicants, including anti-money laundering and know-your-customer investigations into each entity before opening any account.[68]

Access contends its reliance on Leahy's promise was justified. A plaintiff must show it *changed its position based on the promise*, and did so justifiably.[69] Though "justifiable reliance is normally a question of fact, summary judgment is appropriate if reasonable minds could reach but one conclusion."[70] As this court has recognized, "[w]hile reliance requires examination of relevant factors, we reject the contention that such examination cannot be done in a summary judgment motion."[71]

Here, Mattox raised money from investors before receiving *any* purported promise from Citigroup. Mattox formed the LP Funds in November 2011 and raised the funds for the proposed bond purchase before contacting Citigroup. Access does not establish an action or forbearance of definite and substantial character performed in reliance upon Leahy's statements.

---

[67] Meissner v. Simpson Timber Co., 69 Wn.2d 949, 957, 421 P.2d 674 (1966) (quoting RESTATEMENT OF CONTRACTS § 2(1) (1932)).

[68] 31 U.S.C. 5318(h) & (i); 31 C.F.R. §§ 1010.210-.220.

[69] Wash. Educ. Ass'n, 181 Wn.2d at 224-25 (quoting Havens, 124 Wn.2d at 171-72).

[70] Cornerstone Equip. Leasing, Inc. v. MacLeod, 159 Wn. App. 899, 905, 247 P.3d 790 (2011) (citing Havens, 124 Wn.2d at 181).

[71] Stewart v. Estate of Steiner, 122 Wn. App. 258, 275, 93 P.3d 919 (2004).

18

No. 75747-4-I/19

Mattox's declaration, together with the e-mails, do not support his alleged change of position and reliance based on Leahy's statements about setting up accounts.

To determine if reliance is justified, courts also look to

(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.[72]

Mattox is an entrepreneur with over 20 years of experience running businesses, including purchasing bonds. Access did not have a longstanding business or personal relationship with Citigroup, and Access initiated the contact and expressed interest in making a purchase.

Access argues only Citigroup had access to the relevant information, Mattox had no independent capability to detect the fraud, and Leahy's misrepresentations were "specific and pointed, and reasonably calculated to lead Mr. Mattox into believing Citigroup would onboard [the LP Funds] and present their orders."[73] But Mattox had access to the same offering information as Leahy and knew about the upcoming 2012F bond offering before contacting Leahy. The record does not reflect Leahy made a misrepresentation to Mattox or misled him. The alleged "specific and pointed" misrepresentations concerned general, aspirational, and indefinite statements.

---

[72] Id. at 274.

[73] Appellant's Br. at 29.

19

We conclude Access did not change its position and justifiably rely on Citigroup's optimistic intent to onboard the LP Funds.

*D. Negligent Misrepresentation*

Access argues Citigroup negligently misrepresented the facts upon which Access relied.

A plaintiff must prove by clear, cogent, and convincing evidence:

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.[74]

Washington courts apply the *Restatement of Torts* approach.[75] Unless there is clear, cogent, and convincing evidence that the information supplied by the defendant is false, a claim for negligent misrepresentation fails.[76] "[A] false representation as to a *presently existing fact* is a prerequisite to a misrepresentation claim," a discussion about future action is "not a representation of a presently existing fact."[77] Failing to perform "promises of

---

[74] Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

[75] RockRock Group, LLC v. Value Logic, LLC, 194 Wn. App. 904, 914, 380 P.3d 545 (2016).

[76] Elliot Bay Seafoods, Inc., 124 Wn. App. at 14.

[77] Donald B. Murphy Contractors, Inc. v. King County, 112 Wn. App. 192, 197-98, 49 P.3d 912 (2002) (emphasis added). To the extent Access suggests a present state of mind to engage in a future act equates to a "present fact," see Appellant's Br. at 30; Appellant's Reply at 13, Access presents no authority supporting such an expansive view of what constitutes a present fact.

20

future conduct . . . cannot alone establish the requisite negligence for negligent misrepresentation."[78]

In <u>Havens v. C & D Plastics, Inc.</u>, the defendants' alleged oral statements during negotiations promising authority and duration of employment were "promises of future conduct."[79] Our Supreme Court held the plaintiff could not base a misrepresentation on these oral statements because they lacked "any false representation as to a *presently existing fact*, a prerequisite to a misrepresentation claim."[80] Similarly, in <u>Donald B. Murphy Contractors v. King County</u>, the plaintiff argued the county made promises to purchase and maintain insurance for a construction project.[81] This court held the county's "promise to procure insurance was not a representation of a presently existing fact."[82]

Here, Access focuses its negligent misrepresentation claim on Leahy's comments before and after the pricing day. Access contends Leahy's statements misrepresented that (i) "Citigroup was in the process of onboarding," (ii) Citigroup was prepared to accept the orders from the LP Funds through LPL Financial, and (iii) the State was capable of independently allocating bonds.[83]

Leahy communicated obstacles in the onboarding process to Mattox. In Mattox's declaration, he acknowledged Leahy told him about "certain challenges Citigroup was experiencing in the onboarding, but then repeatedly told me it

---

[78] <u>Havens</u>, 124 Wn.2d at 182.

[79] 124 Wn.2d 158, 179-82, 876 P.2d 435 (1994).

[80] <u>Id.</u> at 182 (emphasis added).

[81] 112 Wn. App. 192, 197, 49 P.3d 912 (2002).

[82] <u>Id.</u> at 198.

[83] Appellant's Reply Br. at 13.

21

*would be* 'no problem' to complete the process."[84] This aspirational language does not amount to a presently existing fact. And it was Sharla Cameron of LPL Financial, not Leahy, who suggested the LP Funds could place the orders through LPL Financial and that there was confusion about the name for the accounts.

We conclude Access does not establish Citigroup misrepresented a presently existing fact or reliance. Therefore, the negligent misrepresentation claim was properly dismissed.

## II. Claims Against the State

### A. Tortious Interference

Access argues the State tortiously interfered with its agreement with Citigroup.

> The plaintiff must establish
>
> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.[85]

To survive summary judgment, a plaintiff must present factual evidence to support each element of its claim and cannot rely on assertions or allegations.[86]

---

[84] CP at 1590 (emphasis added).

[85] Leingang, 131 Wn.2d at 157; Pleas v. City of Seattle, 112 Wn.2d 794, 800, 803-04, 774 P.2d 1158 (1989).

[86] Roger Crane & Assocs., Inc. v. Felice, 74 Wn. App. 769, 779, 875 P.2d 705 (1994).

The State argues Access cannot establish intentional interference by the State that induced or caused a breach or termination of Access's relationship or expectancy with Citigroup or that the State interfered for an improper purpose or used improper means.

"[I]ntentional interference denotes purposefully improper interference."[87] An intentional interference "requires an improper objective of harming the person or the use of wrongful means that in fact cause injury to the person's contractual or business relationships."[88]

Here, Evans merely expressed her concerns and did not intentionally interfere. Evans was unsure about the suitability of the EB-5 investors for State bond offerings, and explained that the State wanted to avoid any potential volatility in the market. Evans expressed concerns about the potential EB-5 investments in the 2012F bond offering when the subject came up in meetings with investment bankers and financial advisors, which included Citigroup representatives.

Access does not suggest that the State's interests in ensuring a successful underwriting and market stability were inappropriate. And the lead underwriter for Citigroup testified nobody told him about a governmental investigation of Access before the pricing day.

But even if the State did intentionally interfere, Access must also show that the State "interfered for an improper purpose or used improper means."[89]

---

[87] Schmerer v. Darcy, 80 Wn. App. 499, 505, 910 P.2d 498 (1996).

[88] Id. (citing Pleas, 112 Wn.2d at 804).

[89] Leingang, 131 Wn.2d at 157; Pleas, 112 Wn.2d at 804.

In <u>Pleas v. City of Seattle</u>, our Supreme Court adopted the Oregon Supreme Court's approach that a claim for tortious interference can be established only "'when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means.'"[90]

The improper motive or purpose inquiry focuses on the reasons for the defendant's interference, such as greed or retaliation.[91] "Conclusory statements and speculation will not preclude a grant of summary judgment."[92] Arbitrary and capricious actions may constitute improper means of interference,[93] but exercising one's legal interests in good faith is not improper interference.[94]

Here, Access questions Evans' motives but does not offer compelling authority that its speculative accusations are sufficient to preclude summary judgment. Access contends Evans' actions backfired and caused some bonds to go unpurchased, resulting in a sale on the secondary market, but the focus of the

---

[90] 112 Wn.2d 794, 804, 774 P.2d 1158 (1989) (quoting <u>Top Serv. Body Shop, Inc. v. Allstate Ins. Co.</u>, 283 Or. 201, 204, 582 P.2d 1365 (1978)).

[91] See <u>Schmerer</u>, 80 Wn. App. at 505; <u>Cherberg v. Peoples Nat. Bank of Wash.</u>, 88 Wn.2d 595, 606, 564 P.2d 1137 (1977)).

[92] <u>Elcon Constr., Inc. v. E Wash. Univ.</u>, 174 Wn.2d 157, 169, 273 P.3d 965 (2012).

[93] <u>Pleas</u>, 112 Wn.2d at 805.

[94] <u>Tacoma Auto Mall, Inc.</u>, 169 Wn. App. at 132; <u>Elcon Constr., Inc.</u>, 174 Wn.2d at 168-70 (trial court properly dismissed claim for tortious interference based upon legitimate motive by defendant in protecting its legal interest); <u>Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship</u>, 158 Wn. App. 203, 225-26, 242 P.3d 1 (2011) (trial court properly dismissed claim when plaintiff failed to provide sufficient facts to prove defendant had improper motive).

24

analysis is the motive and purpose, not the end result.[95] Evans expressed the State's legitimate interests in a successful underwriting and maintaining market stability.[96]

Access argues Evans used improper means because Citigroup already had policies in place to assure the bond offering would not fall through, thus, in voicing her concerns to Citigroup, Evans acted "outside the scope of her authority as a deputy treasury secretary."[97] But her duties as deputy treasury secretary include oversight of State bond sales. There is no evidence that Evans instructed underwriters not to cooperate with Access, told the underwriters about any FBI investigation, or urged the underwriters to disregard their own policies.

As to the question of any privilege, Access challenges the validity of Stidham v. State Department of Licensing.[98] But Washington courts have acknowledged the application of overlapping privilege in both defamation and tortious interference settings.[99] In any event, we need not reach the State's alternative argument regarding privilege in this setting.

---

[95] Leahy's alleged statement about things "going on in the back room that I can't tell you about," CP at 1592, does not support a reasonable inference that Evans had an improper motive.

[96] Access suggests Evans' failure to take steps to confirm or deny the basis for her concerns reveals her improper motive but does not offer authority that a formal investigation or inquiry was required.

[97] Appellant's Br. at 35.

[98] 30 Wn. App. 611, 637 P.2d 970 (1981).

[99] Aitken v. Reed, 89 Wn. App. 474, 490-91, 949 P.2d 441 (1998); Liberty Bank of Seattle, Inc. v. Henderson, 75 Wn. App. 546, 564-65, 878 P.2d 1259 (1994); Lawson v. Boeing, 58 Wn. App. 261, 269, 792 P.2d 545 (1990).

We conclude Access does not establish any genuine issue of fact regarding the third and fourth elements of its tortious interference claim. Therefore, it was properly dismissed.

*B. Negligent Misrepresentation*

Access argues summary judgment was improper because there are issues of material fact regarding its negligent misrepresentation claim against the State. As discussed above, a claim for negligent misrepresentation requires a misrepresentation as to a presently existing fact.

Access does not offer compelling authority or citations to the record showing it relied on a presently existing fact communicated by the State. And Access does not establish a causal link between the alleged misrepresentations and its failure to purchase the 2012F bonds. Access relies on its claim that the State misrepresented its role in the bond sale process but repeatedly cites to statements made by Leahy, not Evans.

We conclude Access's negligent misrepresentation claim against the State was properly dismissed.

Therefore, we affirm.

WE CONCUR: