IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| DONALD and KATRINA SIMMONS, husband and wife, | ) ) ) | No. 34343-0-III |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| CITY OF OTHELLO, | ) ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Donald and Katrina Simmons appeal the summary judgment

dismissal of their lawsuit against the city of Othello, arising from the failure of a line

connecting their home to the city's main sewer line. Based on evidence that the failure

occurred in the portion of the line lying under a public alley traveled by heavy city

garbage trucks, the Simmonses contend they are entitled to a trial on the city's liability

for negligence.

A motion to strike some the Simmonses' evidence was well taken. Their admissible evidence fails to present any genuine issue of material fact (1) that the city owed a duty to maintain or repair the line that failed or (2) that the city's operation of its garbage trucks was negligent or was the cause of the line's failure. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

The Simmonses own a home on 10th Avenue in Othello. The record indicates that the home was built in 1957. Beside the home is an alley that runs the length of the block. A city main sewer line, to which the Simmonses' home is connected, runs under the alley.

In mid-March 2014, the Simmonses began experiencing problems with sewer backup in the home. Within a matter of weeks, the lateral line[1] that connects their home to the main sewer line was completely blocked. The city's public works department

---

[1] In this litigation, the city has used a generic term, "lateral line," to describe the entire line connecting the Simmonses' home to the main sewer line. Although the Simmonses have complained that the term is misleading, it is a natural use of the adjective "lateral," which is defined, in part, to mean

> of or relating to the side : situated on, directed toward, or coming from the side  <the ~ branches of a tree>  <a ~ view>

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1275 (1993). We, like the city, refer to the entire line connecting the Simmonses' home to the main sewer line as a lateral line. Use of the term is merely descriptive, having no legal significance.

twice checked the operation of the main sewer line that runs the length of the alley and confirmed it was flowing freely.

The Simmonses ultimately engaged three plumbers to assist in locating and addressing the problem: Vincent Enriquez, who specializes in locating and clearing obstructions from sewer lines but who was unable to clear the Simmonses' lateral line; Arthur Gonzalez, who was brought in to excavate the lateral line, locate and repair the failure; and Rodney Heist, who used a "locater" to help Mr. Gonzalez locate the lateral line and inserted a camera in the line to help find the failure. Clerk's Papers (CP) at 87. Mr. Gonzalez suspected and later confirmed that the failure had occurred in a portion of the lateral line located under the alley. The city's public works department took the position that the failure was still in the lateral line, not the main sewer line, and was the homeowner's responsibility. The city did issue a permit so that Mr. Gonzalez could perform excavation work in the alley.

A week into Mr. Gonzalez's excavation—much of which had to be done by hand because of city gas and water lines in the same vicinity—Ms. Simmons, convinced that the problem was not her responsibility, demanded a meeting with the mayor. The mayor was persuaded that the city should make the repair and promised to send out a city crew. The next day, a city crew installed a new saddle connection to the sewer. Because the undamaged portion of the Simmonses' lateral line would not connect with the new connection provided by the city, Mr. Gonzalez replaced that part of the lateral line.

3

The Simmonses then filed a notice of claim with the city and, when their claim was not resolved, filed suit. Following discovery, the parties filed cross motions for summary judgment.

The Simmonses presented no evidence that the city constructed any part of the lateral line connecting their home to the main sewer line. They presented no evidence that the lateral line, assuming it was installed privately, was ever donated to the city and accepted by it. Their opening brief in support of their motion for summary judgment simply assumed that the portion of their lateral line located under the alley was a part of the city's public sewer system, which the city thereby had a duty to maintain. They also supported their motion with declarations from Messrs. Enriquez, Gonzalez, and Heist, stating their belief that the line failed as the result of heavy garbage trucks operating in the unpaved alley.

The city, recognizing that its municipal code defines "public sewer," acknowledged responsibility for infrastructure falling within that definition but denied that the Simmonses' lateral line did. "Public sewer" is defined by Othello Municipal Code (OMC) 12.04.050 to mean, "a sewer in which all owners of abutting properties have equal rights, and is controlled by public authority." The city argued that the lateral line serving the Simmonses' home did not and could not serve other property owners and was not under its control.

4

On the garbage truck causation issue, the city offered the declaration of a practicing engineer who identified the information that would be needed to determine whether the failure of the lateral line was caused by garbage truck traffic. He explained his opinion why, on a more probable than not basis, a 40,000 pound truck could not break a sewer line or coupling buried 8 to 10 feet underground.

The city moved to strike testimony in a declaration of former Othello mayor Shannon McKay offered by the Simmonses, as well as testimony from the Enriquez, Heist, and Gonzalez declarations. It challenged testimony on the basis that it was either (1) inadmissibly speculative, (2) constituted hearsay, (3) lacked an adequate foundation, (4) constituted inadmissible legal conclusions, (5) contained unqualified expert testimony, or (6) conflicted with prior sworn deposition testimony. The trial court granted the motion to strike the testimony and, after hearing the parties' arguments on the cross motions for summary judgment, denied the Simmonses' motion and granted the city's motion. The Simmonses appeal.

## ANALYSIS

When reviewing grants of summary judgment, our review is de novo and we perform the same inquiry as the trial court. *Volk v. DeMeerleer*, 187 Wn.2d 241, 254, 386 P.3d 254 (2016). Summary judgment is appropriate when there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

5

law." CR 56(c). We construe all facts and all reasonable inferences in the light most favorable to the nonmoving party. *Volk*, 187 Wn.2d at 254.

A defendant may move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case. *Young v. Key Pharm.*, 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Once this showing is made, the burden shifts, and if the plaintiff fails to make a showing sufficient to establish the existence of an element essential to its case, on which it will bear the burden of proof at trial, then the court should grant the motion. *Id.* at 225 (citing *Celotex*, 477 U.S. at 322).

"The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). It applies to our review of the trial court's evidentiary rulings on the city's motion to strike. *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015) (citing *Folsom*, 135 Wn.2d at 662-63).

## MOTION TO STRIKE

CR 56(e) requires affidavits supporting or opposing a motion for summary judgment to be made on personal knowledge, set forth such facts as would be admissible in evidence, and affirmatively show "that the affiant is competent to testify to the matters stated therein." It is well settled that "speculation, argumentative assertions, opinions and

6

conclusory statements will not defeat [a summary judgment] motion." *Suarez v.*

*Newquist*, 70 Wn. App. 827, 832, 855 P.2d 1200 (1993).

*Statements of former mayor Shannon McKay.* The city moved to strike three

statements from the declaration of former Othello mayor Shannon McKay. It moved to

strike the following two statements as lacking a foundation, as apparent hearsay, and as

too speculative:

> During my term as mayor, a homeowner by the name of Mr. Crosier had a
> sewage backup into his basement. Upon investigation it was determined
> that his connection between his house line and the main sewer line had
> been broken in the alley.

CP at 316. "A witness may not testify to a matter unless evidence is introduced sufficient

to support a finding that the witness has personal knowledge of the matter." ER 602.

The Simmonses offered no evidence that the mayor had personal knowledge of the

sewage backup suffered by Mr. Crosier or its cause. This is the type of thing that a city's

mayor could easily have learned from staff. The statements were appropriately stricken

for failure to show personal knowledge.

The city moved to strike a third statement by Mr. McKay as expressing a legal

opinion:

> Based on the municipal code, we determined that the City of Othello was
> responsible for repairing the connection between the residence and the main
> line but we were not responsible for repairing the line from the house to
> that connection.

7

CP at 317-18, 81-82. Courts will not consider legal conclusions in a motion for summary judgment. *Ebel v. Fairwood Park II Homeowners' Ass'n*, 136 Wn. App. 787, 791, 150 P.3d 1163 (2007) (citing *Keates v. City of Vancouver*, 73 Wn. App. 257, 265, 869 P.2d 88 (1994)). Understood as a legal conclusion, the statement was properly stricken. If, as the Simmonses contend, it was offered to show state of mind, it was irrelevant.

*Statements of plumbers Enriquez, Gonzalez, and Heist.* The city moved to strike statements by Mr. Enriquez, Mr. Gonzalez, and Mr. Heist, expressing the belief that the lateral line's failure must have been caused by heavy garbage truck traffic overhead. It argued that the mens' testimony exceeded the scope of permissible lay witness testimony, lacked an adequate foundation, was speculative, and in the case of Mr. Enriquez and Mr. Gonzalez, conflicted with prior deposition testimony.

None of the three men claimed to be testifying to personal knowledge of how the break occurred: all were expressing opinions. The Simmonses do not try to argue on appeal that the men were offering lay opinions. They concede the testimony was offered as expert testimony, based on the three men's "extensive experience and training in the field of plumbing." Br. of Appellant at 10.

The expert testimony of an otherwise qualified witness is not admissible if the issue at hand lies outside the witness's area of expertise. *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999) (citing *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 126 Wn.2d 50, 103-04, 882 P.2d 703, 891 P.2d 718 (1994)). "An expert must stay

8

within the area of his expertise." *Queen City*, 126 Wn.2d at 102. In the absence of evidence that the witness has the specialized training or experience necessary to draw the inference offered, the opinion lacks a proper foundation and is not admissible under ER 702. *Farr-Lenzini*, 93 Wn. App. at 461. An opinion must also be supported by sufficient foundational facts. *Queen City*, 126 Wn.2d at 104. "Where there is no basis for the expert opinion other than theoretical speculation, the expert testimony should be excluded." *Id.* at 103.

The city offered the declaration of Kurt Holland, an engineer with a bachelor of science in civil engineering from Montana State University and over 20 years' practice experience, including projects involving the design and installation of underground sewer lines. He testified:

> In order to determine whether a garbage truck driving over a gravel alley could have caused a sewer line or coupling to break 8 to 10 feet underground, an engineer would need to know (1) the type of soil and energy absorbing/dispersing qualities of the soil above the lateral line; (2) subsurface water levels; (3) calculations of the force created by the weight, number, and frequency of vehicles driving in the alley; (4) specifications of the piping; (5) the weight of the soil above the lateral line; and (6) an analysis of existing adjacent sewer laterals that had not failed. Using this information, the engineer would need to run a number of calculations to determine whether the force created by the vehicles was strong enough to overcome the structural integrity of the pipe and/or coupling. Even with this information and conducting these calculations, it would be nearly impossible to determine with any degree of confidence whether a garbage truck driving down a road could cause an underground sewer line to fail.
> . . . In my experience as an engineer, it is my opinion, on a more probable than not basis, that it is unlikely that a 40,000 pound garbage

9

truck could exert enough force to break a sewer line or coupling buried 8 to 10 feet underground unless there was excessive subsurface ground water. The lines would likely be too far underground to be impacted by the weight of such a vehicle.

CP at 380. The Simmonses did not offer conflicting evidence as to the information needed to analyze causation.

Mr. Enriquez, when asked in deposition if he had any experience or education that would qualify him to have an opinion that heavy trucks driving down an alley could damage a sewer line, testified only that he'd "seen it before," without explaining how he arrived at that theory of causation to the exclusion of others. CP at 175. Later, asked if he had an opinion as to what happened to the Simmonses' lateral line, he answered:

No, I have no opinion other than from what I could say just by looking at the picture is that it's something that's been going on for a while. And eventually like I say, sometimes the sewer systems just get to a point where they start to fail and fall apart. And that just happens over time.

CP at 176.

The opinions expressed by the three men that the city asked be stricken were all to the effect that heavy equipment operating over underground pipes for many years can cause problems in sewer lines, and that they were aware of no other reason the Simmonses' lateral line would have failed. None of the three men explained (1) what evidence would justify concluding that a sewer line failed from being driven over by heavy vehicles as opposed to failing from some other cause, (2) the basis for his knowledge of how to diagnose the cause of a sewer line's failure, (3) what he knew about

10

the duration and character of city garbage truck traffic in the alley adjacent to the Simmonses' home, or (4) what evidence justified drawing the conclusion in this case that city garbage truck traffic was the cause of the failure. Given the lack of foundational facts or any demonstration that the men were staying within the area of their sewer line clearing, plumbing, or septic system expertise, their testimony was appropriately stricken. We need not address whether the testimony should have been stricken for the further reason that it contradicted prior deposition testimony.

## SUMMARY JUDGMENT DISMISSAL

The Simmonses' arguments often sound like they are asserting a restitution claim, but they sued for negligence—for the city's breach of a "duty of reasonable care in the repair and maintenance of the municipal sewer system." CP at 3.[2] To prove negligence, they must prove the existence of a duty, a breach of that duty, and injury proximately caused by the breach. *Kempter v. City of Soap Lake*, 132 Wn. App. 155, 158, 130 P.3d 420 (2006).

"Washington recognizes that a municipality has a duty to exercise reasonable care in the repair and maintenance of the municipal sewage system." *Id.* At issue is whether the Simmonses' lateral line is a part of the municipal sewage system.

---

[2] A restitution claim would fail where the city had no duty to repair the lateral line.

11

The Simmonses' lateral line has not been shown to be part of the municipal sewage system by virtue of ownership of the land, because there is no evidence the city owns the land under the alley. In connection with the summary judgment motions, Mr. Simmons submitted a copy of a 1909 plat that includes his home and that "donate[s] and dedicate[s] to the use of the public forever the streets, Avenues and alleys, shown hereon." CP at 80. RCW 58.08.015 provides that the effect of a donation marked on a plat is considered to be "a quitclaim deed . . . for the purposes intended by the donor or donors, grantor or grantors." For more than a century, Washington decisions have held that the purpose intended by a street dedication is to quitclaim an easement. *Rainier Ave. Corp. v. City of Seattle*, 80 Wn.2d 362, 366, 494 P.2d 996 (1972) (tracing the rule to *Burmeister v. Howard*, 1 Wash. Terr. 207 (1867)). "'[T]he fee in a public street or highway remains in the owner of the abutting land, and the public acquires only the right of passage, with powers and privileges necessarily implied in the grant of the easement.'" *Id.* (quoting *Finch v. Matthews*, 74 Wn.2d 161, 167-68, 443 P.2d 833 (1968)). The owner of abutting land, as the owner in fee of land under the street, has "the right to use the sub-surface of the street for all lawful purposes that are consistent with full enjoyment of the easement acquired by the public." *Lanham v. Forney*, 196 Wash. 62, 65, 81 P.2d 777 (1938); *Nystrand v. O'Malley*, 60 Wn.2d 792, 795, 375 P.2d 863 (1962).

12

The Simmonses have presented no evidence that their lateral line is part of the municipal sewer system by virtue of city ownership of its component parts. The line was presumably privately constructed. The current version of an Othello city ordinance that was first adopted in 1955[3] dictates when property owners must connect to the public sewer. It provides that the owner of real property within the city and within three hundred feet of a sewer lateral or trunk line shall connect its toilet and sewer producing facilities with the public sewer system "*at his own expense*" within 30 days after the city building official mails a notice to connect. OMC 12.12.040 (emphasis added). No evidence was presented that following the home's 1957 construction, its owner, having constructed the lateral line at his own expense, ever donated it to and had it accepted by the city.

Finally, the Simmonses have not presented evidence raising a genuine issue of material fact whether the city has ever assumed the control and management of their lateral line. Under common law, assuming control and management of private sewers is another way that a municipality can make them a part of the public sewer system. *Sigurdson v. City of Seattle*, 48 Wn.2d 155, 161-62, 292 P.2d 214 (1956) (quoting 18 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 53.118, at 467 (3d ed.

---

[3] The Simmonses offered no earlier version of the ordinance, so we assume it was not materially different in 1955.

13

1950). Consistent with common law, city control is a characteristic of the "public sewer" as defined by Othello's municipal code. OMC 12.04.050 (defining public sewer, in part, as "controlled by public authority").[4]

In *Sigurdson*, the city's assumption of control and management of a drainage system constructed by the Works Progress Administration (WPA) was demonstrated by the testimony of an assistant city engineer that the WPA had transferred the maintenance function to the City Engineer's Office; and by the fact that the city had exercised control and management for a period of approximately 18 years, making extensive repairs to the system in 1937, 1941, 1948, and 1950. 48 Wn.2d at 160-61. In the summary judgment proceedings below, the Simmonses offered no historical evidence that the city ever assumed control and management of their lateral line.

Othello's municipal code defines "public sewer" as also being "a sewer in which all owners of abutting properties have equal rights." OMC 12.04.050. The Simmonses

---

[4] *Sigurdson* states, quoting McQuillin,

"Municipal liability is restricted to the public sewers which the corporation controls; it does not extend to private sewers and drains which it did not construct, nor accept. . . . But if sewers, drains or culverts constructed by third persons are, in some legal manner, adopted by the municipality as a part of its sewerage or drainage system, or the municipality assumes control and management thereof, the municipality becomes liable for injuries resulting therefrom, since in such cases it is immaterial by whom the sewer drain, or culvert was constructed."

48 Wn.2d at 161 (emphasis omitted).

14

argue that OMC 12.12.040, the ordinance that requires property owners to connect to the

public sewer, applies to owners of property in the city "within three hundred feet of a

sewer *lateral* or trunk line" (emphasis added), and suggest that the owner of property

within 300 feet of their lateral line could connect to it, thereby making it a public sewer.

But as earlier observed, "lateral" is an adjective describing a spatial relationship between

any two lines, private or public. OMC 12.12.040 must reasonably be construed as

referring only to lateral *public* lines. The ordinance does not say that an owner of

property can connect to any line that is lateral to another, it says that the owner "shall

connect . . . with the public sewer system, at his own expense." Not only is this clear

from a reading of the entire provision, but city design standards also say that "[s]ide

sewer laterals"—meaning the portion of a lateral line falling within a public right-of-way

or easement—"shall be for a single connection only." CP at 49.[5]

---

[5] At the time of the repair, the city had public works design standards in place that used the term "side sewer lateral," which

> is considered to be that portion of a sewer line that will be constructed between a main sewer line and a property line or easement limit line.

CP at 49. The term "private side sewers" is used in the design standards to mean

> the extension of side sewer laterals located outside of the public rights-of-way or easements granted to the City of Othello.

*Id.* These terms contemplate the type of street easement that existed for the alley adjacent to the Simmonses' home. They describe the two parts of the Simmonses' lateral line.

15

No. 34343-0-III
*Simmons v. City of Othello*

Finally, the Simmonses' point to the fact that individuals must obtain a permit to excavate in the city's alleys. But this is irrelevant to the issue of whether a lateral line lying underneath an alley is controlled by the city. OMC 11.08.010, which requires persons to obtain written permission from the street superintendent before obstructing, disturbing, or interfering with the free use of the streets, alleys, sidewalks and other public places, does not assert any control over connections to the main sewer line that are installed by homeowners.

The Simmonses fail to demonstrate any genuine issue of material fact requiring jury trial of their negligence claim.

Affirmed.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

16