IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RICKEY FIEVEZ, individually, KYLE FIEVEZ, individually, and TYLER FIEVEZ, individually,<br><br>    Appellants,<br><br>    v.<br><br>STATE OF WASHINGTON, DEPARTMENT OF CORRECTIONS,<br><br>    Respondent. | No. 84230-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, J. — Appellants brought a negligence action against the Department of Corrections for injuries to Rickey Fievez caused by an individual who had previously been on community custody supervision. The trial court dismissed the claim on summary judgment, and Fievez appeals. Because Fievez fails to demonstrate a material issue of fact as to all four elements of negligence, we affirm.

FACTS

On January 8, 2015, Timothy Day was sentenced under a Special Drug Offender Sentencing Alternative (DOSA) after entering a guilty plea to one count

of felony harassment — domestic violence. Pursuant to the DOSA, Day was sentenced to 19 months in prison, immediately followed by 19 months on Department of Corrections (DOC) community custody supervision. The community custody portion of his sentence ran from March 2016 until October 2017, supervised by Community Corrections Officer (CCO) Natalie Carrigan. During the majority of his time on community custody, Day lived in a home owned by his employer, along with a couple, Becky and David Stinson. Prior to Day's release from prison, and throughout his time on community custody, DOC Crime Victim Liaison (CVL) Sherina James maintained contact with Marceline Daarud, Day's former wife and the victim of his crime of conviction. Day's active community custody supervision ended on September 30, 2017, and was officially terminated on October 2, 2017.

On June 17, 2018, Day stole his fiancée's revolver, shot open an ammunition case in a Walmart store, and attempted to carjack Rickey Fievez. Day shot Fievez through the neck causing tragic injuries and was rendering him quadriplegic. Shortly thereafter, Day was shot and killed by a bystander. Fievez and his children (collectively, Fievez) sued DOC, arguing that DOC staff James and Carrigan had been negligent, and that DOC's negligence proximately caused Fievez's injury. DOC moved for summary judgment dismissal, which was granted. DOC also moved to strike portions of several declarations submitted in support of Fievez's motion opposing summary judgment. The court granted the motion to strike in part. Fievez timely appealed and DOC cross-appealed.

ANALYSIS

Fievez and DOC each present several assignments of error. We review Fievez's challenge to the summary judgment ruling under a de novo standard. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). However, we first resolve the evidentiary issues raised by the parties so that we may consider the legal challenges based only on properly admitted evidence. See Id. ("Before we can consider the evidence in this case, however, we need to determine what evidence is before us.").

I.     Admissibility of Evidence

We review the admissibility of evidence presented in connection with a summary judgment proceeding de novo. Am. Express Centurion Bank v. Stratman, 172 Wn. App. 667, 674-75, 292 P.3d 128 (2012). Affidavits submitted "shall be made on personal knowledge" and "shall show affirmatively that the affiant is competent to testify to the matters stated therein." CR 56(e). An expert witness's opinion must be based on "sufficient foundational facts;" if an expert's opinion is based only on theoretical speculation, it must be excluded. Simmons v. City of Othello, 199 Wn. App. 384, 393, 399 P.3d 546 (2017) (quoting Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 103-104, 882 P.2d 703, 891 P.2d 718 (1994)). "[T]here is no value in an opinion that is wholly lacking some factual basis." Queen City Farms, Inc., 126 Wn.2d at 102-03.

A.      Declaration of Dan Hall

We first turn to the challenged statements in the declaration of Dan Hall, "an expert in the field of community corrections and offender supervision" with "three decades of experience" with the Washington State DOC.  He reviewed materials related to this case and provided expert opinions on DOC's standard of care, breach, and causation.  He opined that DOC failed to adequately prepare for Day's supervision, failed to adequately obtain information about his possession of firearms or search his residence, failed to relay information between different DOC employees, and improperly ended Day's supervision "while he was in active violation of the conditions of his supervision."  He concluded that had DOC exercised slight care, Day would have been incarcerated on the day of Fievez's injury.

Fievez contends the court erred in striking paragraphs 8, 55, 59, 62 (in part), 79, 80, 82, 90, 91, 95, 98, 100-103, 106 (in part), and 113 from Hall's declaration.  DOC cross-appeals, arguing the trial court should have additionally stricken paragraphs 62, 65, and 94.[1]  In several of his opinions, Hall fails to provide a sufficient basis rooted in his experience or the facts of this case.  As such, paragraphs 8, 59, 62 (in part), 79, 80, 90, 91, 95, 98, 100, 101, 103, 106 (in part),[2] and 113 are inadmissible as speculative and the court did not err in striking them.  Paragraph 65 should have been stricken as speculative as well.

---

[1] DOC contends that "the trial court may have misspoken in striking paragraph 95, which was not sought."  It argues the trial court meant to strike paragraph 94 as speculative.

[2] While the court's oral ruling states it struck the entirety of paragraph 106, its written ruling strikes only a portion of the paragraph.  "A written order controls over any apparent inconsistency with the court's earlier oral ruling."  Pham v. Corbett, 187 Wn. App. 816, 830-31, 351 P.3d 214 (2015).  We follow the court's written order.

Additionally, we strike paragraph 102 in part; the last sentence of paragraph 102 is speculative and therefore inadmissible.

However, some of the paragraphs the court struck do have a sufficient basis and we consider them in our analysis: paragraphs 55 and 82. We additionally hold that paragraph 94 is not speculative and decline to strike it.

### B. Second Declaration of Annalise Richmond

DOC asserts in its cross-appeal that the trial court erred in failing to strike paragraph four in the second declaration of Annalise Richmond. Richmond was Day's fiancée at the time of his death; they began dating in June 2017, and she testified that Day moved into her home in either August or September 2017.[3] Richmond stated that she "had been a gun owner for many years," and she had "several firearms" in her home when Day moved in, including "a large rifle propped up behind my jewelry box in plain-sight." She also testified that Day "owned firearms prior to moving in" to her home, including ones she saw "at his prior residence."

DOC contends Richmond's declaration lacked personal knowledge. In paragraph four, Richmond admitted that she never accompanied Day to transport firearms but stated he "never mentioned any other location where he stored personal items," and she was "not aware of any other location that he kept personal items prior to August 2017." However, Richmond does not claim personal knowledge that Day kept firearms in a specific location. She simply

---

[3] In Richmond's first declaration, she testified that Day moved into her home in September 2017. In her second declaration, she testified that Day began moving into her home in August 2017.

stated, "it is my belief that Tim's firearms and personal belongings were more probably than not transported from his prior residence," before again stressing that she "was not with Tim when he moved these items," but rather this opinion was her "best and most informed reasonable inference." Richmond openly admits that her opinion is an inference based on her related knowledge, rather than firsthand information or observation of the subject matter of her declaration (such as where Day kept firearms, or how or when he moved them). Richmond's stated beliefs and inferences go to the weight of her testimony, not its admissibility. We decline to strike it as we do not weigh evidence in reviewing a summary judgment dismissal.[4]

C.    Declaration of David Stinson

Finally, DOC argues the court should have stricken portions of David Stinson's declaration that were later contradicted by his deposition testimony. David[5] and his wife Becky lived in the same home as Day from March 2016 until June 2017. Day and the Stinsons rented the home from their then-employer. David testified that he had little contact with Carrigan. He also stated that "about 2 to 3 months after moving into the house, [Day] came into the house with — what appeared to be — a gun case."

David initially stated that he spoke with Day's CCO, Carrigan, prior to Day moving in, however, in his later deposition he admitted that was untrue. In paragraph seven of his declaration, David testified that Day told David he was

---

[4] Haley v. Amazon.com Services, LLC, No. 83010-4-I, slip op. at 10 (Wash. Ct. App. Dec. 27, 2022) (published in part), https://www.courts.wa.gov/opinions/pdf/830104.pdf.

[5] Because Becky and David Stinson share a last name, we use their first names when necessary for clarity. No disrespect is intended.

permitted to have a firearm since he inherited it. In his later deposition, David admitted that he could not recall that conversation ever taking place. In reply, Fievez does not contest that the statements are untrue; because David later testified that, to his knowledge, the events never occurred, we strike them.

With the admissible evidence clarified, we turn to the merits of the summary judgment dismissal of Fievez's negligence claim.[6]

II.     Negligence Claim

This court reviews a summary judgment dismissal de novo, engaging in the same inquiry as the trial court. Davies v. MultiCare Health Sys., 199 Wn. 2d 608, 616, 510 P.3d 346 (2022). "'[W]e consider all the facts and make all reasonable factual inferences in the light most favorable to the nonmoving party.'" Schwartz v. King County, 200 Wn.2d 231, 237, 516 P.3d 360 (2022) (quoting Lockner v. Pierce County, 190 Wn.2d 526, 530, 415 P.3d 246 (2018)). "Summary judgment is appropriate only when a trial would be useless; there must be no genuine issues of material fact and the moving party must be entitled to judgment as a matter of law." Schwartz, 200 Wn.2d at 237. In ruling on a summary judgment motion, "the trial court may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact" because "our constitution protects the right to

_____

[6] In briefing, Fievez argues the trial court improperly inserted its personal experience into the summary judgment proceeding in violation of ER 605. At oral argument, counsel conceded that our de novo review renders any reasoning by the trial court irrelevant and that this court need not reach the issue. Wash. Court of Appeals oral argument, Fievez v. Dep't of Corr., No. 84230-7-I (Jan. 19, 2023), at 18 min., 27 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011201/?eventID=2023011201. We accept counsel's concession and decline to consider this assignment of error.

have factual issues decided by a jury."[7]   This court may "affirm a grant of summary judgment on any basis supported by the record."   Eylander v. Prologis Targeted U.S. Logistics Fund, 22 Wn. App. 2d 773, 776, 513 P.3d 834 (2022).

"The elements of a negligence cause of action are the existence of a duty to the plaintiff, breach of the duty, and injury to the plaintiff proximately caused by the breach."   Est. of Bordon v. Dep't of Corr., 122 Wn. App. 227, 235, 95 P.3d 764 (2004).   To "defeat a motion for summary judgment dismissal," the "plaintiff must establish an issue of material fact as to each element of negligence." Walter Fam. Grain Growers, Inc. v. Foremost Pump & Well Servs., LLC, 21 Wn. App. 2d 451, 460, 506 P.3d 705 (2022).

Generally, the elements of proximate cause and breach are "questions for the trier of fact."   Est. of Bordon, 122 Wn. App. at 235.   "However, if reasonable minds could not differ, these factual questions may be determined as a matter of law."   Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Finally, an "expert opinion on an ultimate question of fact is sufficient to establish a triable issue and defeat summary judgment" as a general rule.   Strauss v. Premera Blue Cross, 194 Wn.2d 296, 301, 449 P.3d 640 (2019).   However, the expert's opinion must be more than a speculative conclusion or a conclusion based on assumptions.   Id. (quoting Volk v. DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016)).

---

[7] Haley, No. 83010-4-I, slip op. at 10.

A. Duty

Generally, an entity or individual owes no duty to prevent a third party from causing harm to another. Est. of Bordon, 122 Wn. App. at 235 (quoting Couch v. Dep't of Corr., 113 Wn. App. 556, 564, 54 P.3d 197 (2002)). However, "'[o]ne who takes charge of a third person whom [they know] or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent [them] from doing such harm.'" Taggart v. State, 118 Wn.2d 195, 219, 822 P.2d 243 (1992) (quoting RESTATEMENT (SECOND) OF TORTS § 319 (1965)). This duty also operates as an exception to the public duty doctrine: "To succeed in a negligence claim against a governmental entity, the plaintiff must demonstrate the government owed a duty to the individual plaintiff, rather than the public at large." Ghodsee v. City of Kent, 21 Wn. App. 2d 762, 769, 508 P.3d 193 (2022); see also Taggart, 118 Wn.2d at 219 (take charge duty is an exception to the public duty doctrine).

The take charge duty applies to the relationship between DOC and an individual on community custody. Husted v. State, 187 Wn. App. 579, 585, 348 P.3d 776 (2015). The duty is rooted in the CCO's ability "to exercise control" and monitor the supervisee. Id. at 587-88. DOC admits it had a take charge duty over Day during the period of time proscribed by his judgment and sentence; the parties' disagreement is rooted in the timing of the duty analysis. DOC argues that the duty element is analyzed at the time of the injury and, at that point in time, their take charge duty over Day had ended because the supervisory

relationship had terminated by the plain terms of his sentence. In reply, Fievez counters that analysis of duty is tied to the timing of the breach, not the injury.

Several cases have held that when an offender on supervision absconds and a warrant is issued, the take charge duty terminates because the supervisee "cannot be monitored, given direction or sanctioned." Husted, 187 Wn. App. at 588; accord Smith v. Dep't of Corr., 189 Wn. App. 839, 846, 359 P.3d 867 (2015). This Division of the Court of Appeals has recently held in an unpublished opinion that there is no take charge duty where an individual has been sentenced to community custody but DOC had not yet created an active file or assigned a CCO to supervise the individual.[8] Division Two has held, where DOC is supervising an individual solely for compliance with legal financial obligations (LFOs), there is no take charge duty because DOC is not authorized to intervene on any action or inaction by the supervisee other than paying LFOs. Couch, 113 Wn. App. at 569. However, in each of these cases the end of the duty, breach, and harm all took place close in time.

The most factually similar case to the one before us is Binschus v. State. 186 Wn.2d 573, 380 P.3d 468 (2016). There, several plaintiffs sued Skagit County after they were injured by Isaac Zamora, who had previously been incarcerated at the Skagit County Jail. Id. at 576. The plaintiffs argued the county "was on notice that Zamora was in need of mental health services," and had failed to provide a mental health evaluation and subsequent treatment for

---

[8] Smith v. Dep't of Corr., No. 81246-7-I, slip op. at 7 (Wash. Ct. App. July 26, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/812467.pdf. Unpublished opinions by this court "have no precedential value and are not binding on any court," though they "may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

Zamora. Id. Our State Supreme Court affirmed the summary judgment dismissal based on its analysis of the duty element. Id. at 583. The court stated "the take charge duty is fundamentally about control," and liability stems "from negligently failing to control, not failing to protect against all foreseeable dangers." Id. at 578-79. The court explicitly declined to expand the take charge duty into "a general duty to prevent a person from committing criminal acts in the future." Id. at 580-81. Applying Restatement § 319, the court held Skagit County only owed a duty to control Zamora "during the time when Skagit County had a take charge relationship with Zamora," and that duty was only owed to individuals "who might foreseeably suffer bodily harm resulting from the failure to control Zamora." Id. at 581. Because "the crimes Zamora committed after his lawful release were not a foreseeable consequence of any failure to control Zamora during incarceration," the county owed no duty. Id. However, the court went on to explicitly note that:

> This is not to say that jails can never be liable for a former inmate's actions. First, there may be situations in which a jail's failure to control an inmate results in foreseeable injury to others, and the jail may be liable even if that injury occurs after the duty to control ended. For instance, a jail could fail to control a violent inmate by negligently allowing him or her to escape one week before he or she was scheduled to be released. Even if the inmate injured others after the scheduled release date (and thus after the jail's duty to control had theoretically ended), the jail might still be liable if its failure to control the inmate during incarceration was the proximate cause of the injuries.

Id. at 581-82 (emphasis added). It likened that hypothetical to the scenario presented in Petersen v. State, where "the psychiatrist could be liable for that failure to control the patient, even though the injuries to the victim occurred after

the duty ended." Id. at 582 (citing Petersen v. State, 100 Wn.2d 421, 671 P.2d 230 (1983)). While Petersen was rooted in § 315 of the Restatement, the court analyzed the element of duty where the injury occurred five days after a patient was discharged. 100 Wn.2d at 424-26.

DOC contends that Division Two of this court "has already rejected an attempt to extend the duty past the period of supervision." In a 2006 case, Division Two stated that where an individual on DOC supervision did not murder the victim until "10 months after DOC's duty ended, DOC did not owe a duty of care to Hungerford-Trapp to control Davis's behavior at the time of her death." Hungerford v. Dep't of Corr., 135 Wn. App. 240, 257, 139 P.3d 1131 (2006). The court held that, "DOC owes a duty of care to those who an offender might injure while DOC is supervising the offender," and that "once that special relationship ends, the exception to the public duty doctrine expires." Id. at 258. In an unpublished July 2021 opinion, this court cited to Hungerford, holding that "the DOC owes a duty to those who are injured during an offender's active supervision, not after it ends" and "[t]he DOC is not liable for future crimes of previously supervised offenders."[9] The Hungerford court relies on Taggart, but nothing in Taggart at the referenced pin cite states the attributed rule. See Id. at 258 (citing Taggart, 118 Wn.2d at 220). Rather, page 220 of Taggart recites the general rule that parole officers have a take charge duty over parolees, before analyzing cases from other jurisdictions. 118 Wn.2d at 220. Nothing in Taggart states when the duty ends or at what point duty is to be analyzed. More critically,

---

[9] Smith, No. 81246-7-I, slip op. at 9.

Hungerford's holding seems to be contrary to the Binschus opinion, which is binding authority.[10]   Accordingly, we decline to follow Hungerford and instead adhere to our State Supreme Court's language in Binschus.

DOC may be liable under its take charge duty for injuries that take place after its supervising relationship has ended so long as the breach occurs during the supervisory relationship.  DOC cautions that such a rule "would require DOC to monitor offenders in perpetuity even when it has no authority to do so."  However, the temporal separation between the end of the supervisory relationship and the injury is analyzed through the element of causation.  The further an injury is from the end of DOC's ability to control an individual, the more tenuous the relationship between any breach and the injury.  Fievez has, at a minimum, raised a material issue of fact as to duty.

B.    Breach[11]

DOC and its CCOs are only liable for civil damages if "the act or omission constitutes gross negligence."  RCW 72.09.320.  "Gross negligence most obviously differs from simple negligence in that it requires a greater breach." Harper v. State, 192 Wn.2d 328, 340-41, 429 P.3d 1071 (2018).  "[A] person acts with gross negligence when he or she exercises 'substantially or appreciably' less than that degree of care which the reasonably prudent person would exercise in the same or similar circumstances."  Id. at 343 (alteration in original)

---

[10] As a general rule, the individual divisions of this Court of Appeals are not bound by the decisions of the others.  In re Pers. Restraint of Arnold, 190 Wn.2d 136, 154, 419 P.3d 1133 (2018).  Rather, decisions from other divisions are afforded persuasive authority.  Id.

[11] While the trial court ruled Fievez had raised a material issue of fact as to breach, we are not bound by the trial court's reasoning or ruling as our review is de novo.  As such, we analyze that element here.

(quoting Nist v. Tudor, 67 Wn.2d 322, 331, 407 P.2d 798 (1965)). In considering gross negligence, courts "must focus their analysis on 'the hazards of the situation confronting the actor.'" Id. at 344 (quoting Nist at 331). The court should examine what action the defendant allegedly failed to take along with "any relevant actions that the defendant did take." Id. at 343. To avoid dismissal on summary judgment, the plaintiff bears the burden to "provide substantial evidence of serious negligence." Id. at 345-46. The "[f]ailure to exercise slight care does not mean the total absence of care but care substantially less than ordinary care." See 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 10.07 (7th ed. 2022).

Before the trial court, Fievez largely relied on the failures of James and Carrigan to discover violations of Day's community custody conditions. Fievez's expert, Hall, opined in his declaration that "DOC failed to exercise even slight care in the community supervision of Timothy Day" when: James failed to communicate Daarud's concerns to Carrigan, Carrigan failed to directly reach out to James regarding safety threats, Carrigan failed to review Day's criminal and community supervision history, Carrigan failed to more closely monitor Day's residence and communicate more frequently with the Stinsons, and Carrigan closed out Day's supervision while he was purportedly in violation of his community custody conditions.

Fievez additionally contends Carrigan committed "15 'policy errors'" which constituted a breach of her duty of care. Community Custody Supervisor (CCS) Liza Rohrer, Carrigan's supervisor, performed a case review in June 2018, and

reported that Carrigan failed to meet the contact standards for the first three months of Day's supervision. Carrigan was "not aware of the requirement for DOSA offenders to" submit to weekly urinalysis (UA) and therefore she "did not supervise offender Day in accordance with policy within the first 3 months of the offenders supervision period." Rohrer also reported that Carrigan failed to make the requisite monthly collateral contacts on three separate occasions during his supervision: June 2016, October 2016, and January 2017. Fievez makes much of this report but fails to accurately contextualize the "15 policy errors." Rohrer's report demonstrates that Carrigan's policy errors occurred early on in Day's supervision (the first three months), and, while she missed three collateral contacts, Carrigan made "frequent collateral contacts . . . during the months of March, April, May, June and July of 2017." The report also reflects that Day participated in the "T4C"[12] program, and he completed his substance use evaluation as required. Day's community custody records also provide context for the alleged policy violations in that they demonstrate his overall compliance with conditions of supervision. For example, Day maintained employment throughout his time on community custody, every breathalyzer and UA test he provided was negative, he showed Carrigan his room the two times he was asked, he informed Carrigan when he left the county and returned on several occasions, and he successfully completed domestic violence treatment.

As to the failure to review Day's criminal history and records from prior time on community supervision, Hall heavily relies on deposition testimony from

---

[12] "Thinking for a Change."

another CCO, Ted Creviston. Creviston testified that it was his practice to review records from prior community custody supervision, such as the "chronos" and "field discipline." Rohrer testified that "she expected CCOs to be familiar with an offender's criminal history." These opinions are sufficient to raise a question of material fact regarding breach of the duty of slight care based on Carrigan's alleged failure to review records related to Day.

Hall next opined that Carrigan failed to exercise slight care because she should have made more contacts with the Stinsons specifically and should have more closely monitored Day's residence. However, this is a far cry from the slight care standard we must apply under RCW 72.09.320. Hall contends Carrigan spoke with Becky and David Stinson each only one time: once with Becky "to confirm that there were no firearms or controlled substances in the home," and an introductory conversation with David. Hall also states Carrigan failed to exercise slight care by neglecting to leave a business card or contact information with the Stinsons. He relies on a statement by Creviston that he "'often' makes collateral contact with an offender's roommates," as well as DOC policy requiring CCOs to make monthly collateral contacts with third parties which "may include . . . [f]amily members, significant others or roommates." But, Hall provides no testimony, policy, or other factual basis to support the contention that Carrigan failed to exercise slight care by making collateral contacts with Day's employer (and landlord) rather than the Stinsons; effectively that Carrigan breached the duty of slight care because the collateral contacts she made should

have prioritized certain categories of people over others. As such, Fievez fails to raise a material issue of fact as to breach on this basis.

Hall also asserts that James was negligent in failing to relay concerns from Daarud to Carrigan. Daarud was concerned that Day could access firearms and "told James that she was receiving 'strange hang[-]up calls.'" Hall relies on testimony by Victim Services Program Manager Sheila Lewallen "that she would have created a 'community concern chrono' — which would be visible to Day's CCO — and personally reached out to Day's CCO if she had received and had access to the constellation of information in James' possession" during the relevant time period. Hall also relies on DOC Policy 390.300(IV) which requires a CVL to document threatening behavior or unwanted contact with a past or potential victim. But, as with Hall's opinion regarding the handling of collateral contacts, one witness's assertion that they would have exercised their discretion differently is not sufficient to demonstrate that James failed to exercise slight care.

James exercised her discretion in declining to enter a community concern chrono, particularly where Daarud's reports regarding hang-up calls took place during the same conversation where Daarud noted her concerns about Day's possible access to firearms, despite admitting she had not seen Day with firearms since before 2015. James had no information indicating that Day was responsible for the hang-up calls Daarud was experiencing, other than Daarud's assertions to that effect, and as such Policy 390.300(IV) is inapplicable. Further, while Fievez repeatedly refers to Day's "firearm fetish" in briefing, and at oral

argument before this court, the record does not demonstrate that a firearm was involved in the crime of conviction for which he was on community custody. Day's prohibition from accessing firearms was based upon his prior conviction history for felony crimes, which is true for many individuals subject to community custody.[13] Fievez fails to raise a material issue of fact as to breach on this basis.

As to Carrigan's closure of Day's community custody while he was purportedly out of compliance, Hall alleges Day was in active violation of his conditions by failing to make additional reports while homeless. However, the record does not support the assertion that Day ever definitively informed Carrigan he was homeless or living out of his truck; rather, he reported that he was considering living in his truck as he was struggling to afford the rent at his current residence. Hall does not opine that a failure by Carrigan to investigate or discover whether Day was truly homeless constitutes gross negligence; rather, his opinion presumes that Day was out of compliance and Carrigan terminated supervision despite that noncompliance. Hall does not contend that the failure to investigate further into Day's statement that he was considering living in his truck itself constituted gross negligence. Fievez fails to raise a material issue of fact as to breach on this issue.

Because Fievez raises a material issue of fact as to breach on one of the offered bases, we next turn to the question of proximate cause based only on Carrigan's failure to review records relevant to Day.

---

[13] Fievez provides no evidence that Day's firearm restriction was a function of anything other than his prior felony conviction history. Nearly all crimes of conviction which give rise to a community custody sentence are felonies, so it logically follows that most individuals serving community custody are subject to firearm restrictions. See RCW 9.41.040; RCW 9.94A.501, .701.

C.      Proximate Cause

Fievez argues the trial court erred by ruling on proximate cause as a matter of law.   The crux of Fievez's proximate cause argument is that had Carrigan exercised slight care in supervising Day, she would have discovered acts or behaviors that constituted criminal conduct and Day would have been incarcerated based on either revocation of his DOSA or new criminal charges.

While proximate cause is generally a jury question, it "may be a question of law for the court if the facts are undisputed, the inferences are plain and inescapable, and reasonable minds could not differ." Est. of Bordon, 122 Wn. App. at 239.   Proximate cause consists of two elements: "legal causation and cause in fact." Id.   "There is cause-in-fact if a plaintiff's injury would not have occurred 'but for' the defendant's negligence;" there is no cause in fact "if the connection between an act and the later injury is indirect and speculative." Id. at 240 (quoting Walker v. Transamerica Title Ins. Co., 65 Wn. App. 399, 828 P.2d 621 (1992)).   To demonstrate cause in fact, "[t]here must be a direct, unbroken sequence of events that link the actions of the defendant and the injury to the plaintiff." Joyce v. Dep't of Corr., 155 Wn.2d 306, 322, 119 P.3d 825 (2005). Legal causation, in contrast, "rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend." Taggart, 118 Wn.2d at 226.

Here, Fievez raised a material question of fact on the element of breach based only on Carrigan's failure to review Day's criminal history and records from previous community custody supervision.   Hall opined that, had Carrigan

reviewed the records, she would have monitored Day's residence more closely and "prioritize[ed] collateral contacts with his roommates." Hall stated that, had Carrigan implemented this heightened monitoring, "more probably than not she would have discovered the firearms in Day's residence,[14] thereby leading to his immediate arrest, detainment, and incarceration pending criminal processing." But Hall presents no direct, unbroken sequence of events linking Carrigan's failure to review the relevant records before beginning supervision to Day's shooting of Fievez more than two years after this identified breach, over eight months after supervision ended.[15] Even affording Fievez all reasonable inferences, there is no material question of fact as to the element of causation. He fails to present more than a speculative theory that additional contacts or preparation by Carrigan would have led to the discovery of acts that constituted a violation of Day's community custody conditions, or that constituted criminal conduct, and that, based on these acts, Day would have been detained on the day of Fievez's injury.[16] Because "the facts are undisputed, the inferences are

---

[14] As a preliminary matter, Hall's declaration does not specify whether he is referring to Day's DOC-approved residence he shared with the Stinsons, or Richmond's home where he lived in the final months of his term of community custody. If the former, the Stinsons only noted that they saw Day with a rifle case, and that was in the spring of 2016. Neither ever observed an actual firearm in Day's possession while they resided together, nor did they report the rifle case incident to anyone until discovery was conducted pursuant to Fievez's lawsuit.

Richmond testified that she had a number of firearms in her home, where Day was residing beginning in August or September 2017. The firearm Day used in the shooting at issue belonged to Richmond, but based on Richmond's declaration as to the timeline of their relationship, Day's access to Richmond's firearms could not have occurred until well after the timeframe Hall appears to reference in his declaration.

[15] Day began supervision in March 2016, and completed supervision on October 2, 2017; the shooting took place on June 17, 2018.

[16] The claim that Day would have been incarcerated on the date Fievez was shot necessarily relies on layers of speculation on matters of prosecutorial discretion, discretionary rulings of the trial court, and Day's strategic choices as to the defense against what are ultimately fictional criminal charges. Asked at oral argument before this court whether the incarceration aspect of his theory would have been based on revocation of Day's DOSA sentence, pretrial

plain and inescapable, and reasonable minds could not differ," proximate cause was properly determined at the summary judgment phase. Est. of Bordon, 122 Wn. App. at 239.

While Fievez demonstrated that DOC breached the duty of slight care when Carrigan failed to review Day's criminal history and prior supervision records before undertaking his supervision in March 2016, he is unable to demonstrate a causal connection between that breach early in Day's supervision and the tragic events that occurred eight months after DOC closed out Day's file. Fievez's claim is likewise undercut by "considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its actions should extend." Taggart, 118 Wn.2d at 226. The injury-causing act is so disconnected from the only breach by DOC for which Fievez was able to demonstrate a genuine issue of material fact that imposing liability on DOC would

---

detention on a new charge, or a sentence on a new charge, Fievez replied that it could be any of those possibilities. Wash. Court of Appeals oral argument, Fievez v. Dep't of Corr., No. 84230-7-I (Jan. 19, 2023), at 1 min., 05 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023011201/?eventID=2023011201.

 While Fievez is entitled to all favorable inferences based on the facts presented, this aspect of his argument rests entirely on speculation. Given Day's satisfactory completion of the other terms of the DOSA sentence, it is a leap to suggest that access to firearms (which could arguably support constructive possession under the law) would have resulted in immediate revocation of the remainder of Day's DOSA sentence, particularly within the framework of the DOC "swift and certain" sanction policy. DOC Policy 460.130. Even if Day had been revoked for noncompliance when he was living with Richmond without DOC approval, revocation alone could only have resulted in the imposition of the remainder of his sentence which, at that point in time, was only 40 more days.

 The other possibilities regarding incarceration based on a new criminal charge rest on presumptions that fly in the face of the discretion held by each elected prosecutor, and their deputies by extension, as to the filing of charges and the presumption of release under CrR 3.2. These theories require a conclusion that Day would have either been denied pretrial release or unable to post bail, or, stretching credulity even further, that he would have not only proceeded to trial, but been convicted and sentenced so that he would have been serving time on the date of Fievez's shooting. Inferences in favor of the nonmoving party do not include such unrestrained chains of speculation.

be contrary to policy and common sense.  We affirm the trial court's dismissal of Fievez's claim.[17] [18]

WE CONCUR:

---

[17] While DOC also contends Fievez fails to demonstrate a material question of fact as to proximate cause due to superseding, intervening causes, because we affirm the dismissal on the basis set out in this section, we need not reach that issue.

[18] Prior to oral argument, Fievez moved this court to strike a portion of DOC's cross-appellant reply brief as not sufficiently related to the issues raised on cross-appeal.  Motion to Strike at 2-3.  To the extent the brief was unrelated to the cross-appeal issues, we decline to consider it, but the motion to strike is denied.